ARTHUR A. WILSON AND JEAN C. WILSON, PLAINTIFFS-APPELLANTS, v. THE BOROUGH OF MOUNTAINSIDE IN THE COUNTY OF UNION, A MUNICIPAL CORPORATION, AND THE BOARD OF ADJUSTMENT OF THE BOROUGH OF MOUNTAINSIDE, IN THE COUNTY OF UNION, DEFENDANTS-RESPONDENTS.

Argued December 3, 1963—Decided June 22, 1964.

428

*Mr. Melvin J. Koestler* argued the cause for plaintiffs-appellants (*Messrs. Koestler & Koestler,* attorneys).

*Mr. Irvine B. Johnstone, Jr.* argued the cause for defendants-respondents.

The opinion of the court was delivered by

HALL, J. This case tests the validity of the use zoning of plaintiffs' 12-acre tract fronting on U. S. Highway Route 22 in the Borough of Mountainside, Union County. They were denied a recommendation for a variance by the board of adjustment, *N. J. S. A.* 40:55–39(d), to permit commercial utilization of the entire parcel instead of a limited business use in one corner allowed by an earlier variance and single-family residential use specified for the parcel by the current municipal zoning ordinance. This action in lieu of prerogative writ was then instituted in the Law Division to set aside the denial and, alternatively, to strike down the residential classification as invalid. In addition, the suit sought a declaration that particular provisions of the zoning ordinance imposing certain special regulations on the establishment of business and industrial uses, as well as comparable provisions of the planning board ordinance, constitute an improper method of land use control. The trial court decided all issues against plaintiffs. We certified their appeal on application while it was pending in the Appellate Division. *R. R.* 1:10–1A.

The thrust of the attack was a claim of unreasonable ordinance classification of plaintiffs' property for residential use and a contention that all highway frontage zoning in the

borough was void by reason of an illegal method of control whereby such frontage had been limited by the ordinance to residential use over a long period of years and indiscriminate individual deviations therefrom for business and industrial uses had been regularly allowed through administrative action. The additional assault on the special regulatory provisions of the current ordinances is broadly a part of the latter aspect of the attack. It is most important to keep in mind that plaintiffs sought relief not just with respect to that portion of their property close to the highway but for its entire depth of nearly 900 feet.

The basis asserted for the variance was, save in one respect relating to alleged peculiar physical characteristics of the interior of the property, the same as that grounding the claim of invalidity of the zoning classification. Consequently, plaintiffs confined their proof before the trial judge on this issue to the evidence they offered in the board of adjustment to support the variance application together with their cross-examination of opposing witnesses. The defense evidence substantially consisted of a live repetition of the opposition testimony before the board. In view of the broad sweep of the contentions, the geographical and historical facts of the community as well as of the particular property are essential for consideration of the issues.

Mountainside is situated some 12 miles southwest of Newark in the midst of what has become in the last 10 to 15 years a heavily developed ring surrounding the North Jersey central urban core. The ring development, residential, commercial and industrial, extends a considerably further distance. If it is thought of as a half wheel, the spokes are made up of several through highways passing through the ring and on into further parts of the State and beyond. Route 22 is one of the most important of these spokes, running from U. S. Route 1 near Newark Airport generally westerly through the densely developed areas of Union and eastern Somerset counties into west central New Jersey, central Pennsylvania and further. At least three quarters of Mountainside's four-

square-mile area lies on the southerly slope of the Watchung hills. Route 22, a divided highway with two or more traffic lanes in each direction, traverses the entire two and one-half mile width of the borough from east to west at the foot of the slope. The balance of the community extends south of this highway to the boundary of the Town of Westfield. Beyond the sizeable amount of county park lands, located both on the top of the ridge and bordering Westfield, the business development along Route 22 to be described, and a few neighborhood stores located some little distance south of the highway near the Westfield line, the land use is entirely that of high-class, single-family residences. These dwellings, now housing a population of about 6,500 which has increased more than five-fold since 1940, cover the hilly slope to a considerable extent and also occupy most of the limited amount of available land south of the highway. None front thereon except a small number which antedated the highway business development and still remain in residential use and two or three constructed since in connection with a business use on a particular property. The growth along the highway has not been residential but of a distinctly commercial character, for the most part unrelated to the single-family dwelling development of the remainder of the community, and in many respects typical of what has happened in numerous other New Jersey towns bisected by through highways where there has been no limitation of access thereto by abutting owners or from intersecting local streets.

The highway, first designated State Route 29, was constructed a little over 30 years ago. As distinct from a virgin right of way as in most of its other courses, through Mountainside it utilized the route of an existing county road known as Springfield Road, which ran from Scotch Plains on the west to the center of Springfield on the east. Mountainside was at that time really only a country village, off the beaten track, with a population of about 1,000. The land uses on Springfield Road, though it was the main thoroughfare, were mixed, but by no means dense—a number of large and small

houses on large and small lots, some properties even devoted to small scale agriculture with roadside stands, a few scattered local stores and service establishments, community service buildings and a very considerable amount of vacant frontage.

The tract now owned by plaintiffs lay on the north side of the county road about equidistant from the Scotch Plains and Springfield borders and 1,500 feet or so east of the intersection of New Providence Road, which runs from Westfield over the hill to the Summit area. Its southwest corner was then, and now, occupied by an old mansion type structure, at that time used as an orphanage. The balance of the parcel was and still is vacant land. Slightly to the east of it on the county road was a church. Apparently to save the church from destruction in view of the need to widen the road for the new highway, the highway was divided near the orphanage structure for several hundred feet, the east bound lanes going south of the church on the right of way of the county road and the west bound lanes occupying a new road bed on a curve and rise between the church and the orphanage property. An island was thus created, known as Chapel Island, on which the church remained, and frontage of about 960 feet on the north side of the west bound lanes of the highway resulted for what is now plaintiffs' property. (Since the original construction, the State has acquired the easterly 600 feet of this frontage, to a depth of 100 feet, subject to a right of access to the interior across the same. This strip, like some others similarly acquired along other parts of the highway, has remained vacant and apparently it is intended that it always remain in that condition as some kind of a buffer.) The 12-acre tract thereby became trapezoidal in shape, with a depth of almost 900 feet and a rear line approximately 375 feet long.

The history of highway land use control in Mountainside is divided into two periods. The first commenced with the initial zoning ordinance adopted in 1933 and extended to late 1955, when the second and current period began upon the enactment of a new ordinance.

The pattern of purported regulation during the first period amounted, legislatively, to a classification of all highway frontage for single-family residential use only, save for a few ordinance amendments permitting commercial use on specifically described parcels and the creation in 1952 of a very small industrial zone at the extreme easterly end of the borough. The classification was completely without regard to existing nonresidential uses or any foresight or plan to deal with the pressures and changes which an interstate highway would inevitably bring. The ordinance limitations were coupled with an almost incredible, deliberate course of administrative action by the board of adjustment and governing body which can only be characterized as about as great a perversion of proper zoning as could be imagined. This was the indiscriminate granting of variances for nonresidential uses, with the result that the blanket residential classification meant practically nothing even if it could be conceived of as intrinsically valid *in toto*. The evidence shows that from 1945 until the passage of the 1955 ordinance 44 use variances for highway property were granted, and only six denied, for the whole gamut of uses which has become so distressingly familiar in almost solidly lining through highways in metropolitan and suburban areas — gasoline stations, garages, restaurants, motor courts, bowling alleys, driving ranges, real estate and other offices, stores, show rooms and warehouses, service establishments, light manufacturing businesses, and so on *ad infinitum*, involving new buildings, enlarged use of existing business structures, conversion of former residences and the like. The record further shows that, almost without exception, these variances were also illegal (had they been seasonably attacked) because recommended by the board of adjustment without any findings whatever of justifying reasons or satisfaction of statutory criteria. The conclusion is irresistible either that allowance was dictated by whim, caprice or even favoritism or, at the very best, that the board of adjustment and the governing body had no conception of, or were improp-

erly advised as to, their legal duties, limitations and general responsibilities.

Among the variances so granted was one to McIntyre, plaintiffs' predecessor in title, in 1949 to use the former orphanage building on the southwest corner of the tract, including land on which it stands and surrounding it 362 feet front by 232 feet deep, for a retail furniture business. (This frontage roughly covers that between the westerly end of the property and the westerly end of the previously described strip owned by the State.) McIntyre conducted such a business until he sold the entire property to plaintiffs in 1955, who continued it thereafter. The business was, however, inactive at the time of trial, allegedly because of general modern inadequacy of the ancient structure.

It is apparent that by 1955 the municipality realized the tragic error of its ways and has since sought at least to bring those ways to a halt by the adoption of the new ordinance in that year and subsequent abandonment of land use control by administrative action. Between the end of World War II and 1955, the phenomenal increase in the use of motor transportation both for people and products, the population explosion with consequent vast development home building, and the movement of business and industry to sites out of the cities, had produced radical changes in the use of vast quantities of vacant land in the ring area. While established highways made most of this physically and economically possible, they had become badly overburdened and, especially by reason of the great number of business establishments constructed along them in suburban and even rural areas, they had to serve not only their primary function of moving traffic but also that of providing access to the abutting businesses, the customers and employees of which in turn added to the traffic volume. And most of these highway businesses, as in Mountainside, were intended to serve or employ not those living in the near neighborhood but rather people from beyond the community who found them conveniently accessible by motor. Route 22 had become, in its first 25 or 30 miles west of New-

ark, one of the most overcrowded of these highways both in volume of traffic and number of commercial and industrial establishments lining its sides. There were few substantial gaps between the latter. It was and is an important interstate truck and passenger car route, a "rubber railroad" for commuters and others who had acquired homes in the broad area which it serves and a "Main Street" for the patrons of its businesses. Its traffic density and hazards and general ugly appearance, due in large measure to lack of appropriate planning and zoning controls in so many municipalities, are notorious. In Mountainside itself, traffic, increasing year by year, had reached a flow of 40,000 to 50,000 vehicles per day at the time of trial.

Consistent with this over-all pattern, by 1955 the easterly mile of Mountainside's highway frontage running from a short distance east of plaintiffs' property to the Springfield line, in which most of the previously described variances had been granted, was an almost indescribable hodgepodge of business enterprises of the type described. Few people still lived there, and it had admittedly lost all value for residential purposes. Little vacant property remained. The chairman of the planning board in his testimony called it "a commercial slum * * * a mess * * *." The 1955 ordinance divided this one mile frontage into two use classifications. The easterly part was placed in an industrial zone which included not only the highway frontage but a very considerable amount of land in the rear thereof on both sides of the road. The only uses permitted anywhere in this zone are non-nuisance manufacturing, processing, warehousing and allied activities. Retail and residential uses (except for a caretaker) are specifically prohibited. The westerly part of the mile which ran to the westerly end of this intensive commercial development, a point just short of Chapel Island and about 1,000 feet east of plaintiffs' property, was strip zoned by the ordinance in a restricted commercial zone, defined as "intended for the conduct of low-traffic generating, light manufacturing business and professional purposes." Only manufacturing, processing

and warehousing, professional offices and laboratories and warehouses are permitted. Retail sales and services and all residential uses are expressly forbidden. All of the numerous retail establishments along this mile which had been previously established by variance or other means were thereby rendered nonconforming. The evidence shows that the municipal thesis behind the restrictive zoning of this mile of frontage was that, while limitation to residential use could no longer be justified, the permitted uses would generate less additional highway traffic than retail businesses. The development therein since the 1955 ordinance has been in conformity with its limitations and no variances have been granted.[1]

The remaining highway frontage from the restricted commercial zone west to the Scotch Plains line was retained in the single-family residential classification in 1955. The only additional permitted uses are public buildings, churches, general agricultural activities and professional offices and studios contained in a residence building.[2] This distance is rather naturally divided into easterly and westerly segments for our purposes.

The easterly segment, in which plaintiffs' property is located, runs for about 3,000 feet from the end of the restricted commercial zone to just beyond the New Providence Road intersection. It is the present character of this segment, coupled with its proximity to the intensive commercial development to the east and the general detrimental effect of the highway itself, which grounds plaintiffs' contention of intrinsic ordinance unreasonableness in limiting their property to

---

[1] The reasonableness of the 1955 zoning of this portion of the highway frontage is not attacked and we express no opinion with respect thereto.

[2] The only zone in the borough provided for retail business by the ordinance is the small pocket occupied by the neighborhood stores south of the highway at the Westfield border. Light manufacturing and processing are also allowed therein. Incidentally, this zone is also the only area where filling stations or public garages are permitted and the total number in the borough is limited to 13.

residential use (and the limited business use permitted by the 1949 variance).[3]

This frontage underwent much less change in the 1945-1955 decade in comparison with the business development to the east, perhaps due to the fact of public ownership of a good part of the land, much of which has remained vacant. But by 1955 the great majority of uses were public or retail business, the latter antedating the construction of the highway or established by virtue of variances granted in the ten-year period. Only one private structure has been erected since, an office building replacing a deteriorated dwelling for which a variance was allowed in 1957. This has been the only private variance granted along the entire borough highway frontage since the 1955 ordinance. In 1945 there were perhaps a dozen dwellings in the stretch. Today only five remain which are used exclusively for residential purposes (out of a total of about 20 buildings). There has been no dwelling construction in the segment for many, many years.

At the time of the trial the south side of the highway showed the following land uses, running westerly from the end of the restricted commercial zone: opposite Chapel Island, a long strip of vacant county park lands, a retail liquor store with apartment above, the borough fire house, the borough hall, and two old dwellings used also as tourist homes; beyond Chapel Island, two homes, a dwelling property also used as a nursery, another home, a vacant state-owned tract, a long stretch of land occupied by a large public school and playground, and, at the southeast corner of New Providence Road, the rescue squad headquarters. At the southwest corner of the intersection, and for several hundred feet beyond, is a concentration of commercial activity—a gas station which antedated 1933, the new office building previously referred to, a large roadside restaurant business which was also started

---

[3] While the complaint naturally sought invalidation of the classification only as to plaintiffs' property, the theory and proofs might well be equally applicable to much of the other privately held highway frontage in the segment.

prior to the enactment of the first zoning ordinance, and a very substantial truck sales and service establishment which was the beneficiary of an admittedly ill-advised variance ten or more years ago. On the north side, again running westerly from the restricted commercial zone and opposite Chapel Island, we find a high bank of vacant land, 800 feet or so long and 100 feet deep, owned by the State (the rear of the houses in a development to the north is just beyond this strip), and the previously described 600-foot state-owned strip along a portion of plaintiffs' property; beyond Chapel Island, plaintiffs' furniture business in the old orphanage building, a house, a real estate office with living quarters above and a strip of vacant state and municipally owned land running to the northeast corner of New Providence Road. On the northwest corner is an old home.

The remaining segment of highway frontage, running west from the area just described to the Scotch Plains line, is one of the few unspoiled gaps in the first 30 miles of Route 22, with a notable absence of commercial activity and, indeed, of development or growth of any kind. In view of the municipality's course of zoning conduct between 1945 and 1955, this is probably more fortuitous than the result of good planning, but plaintiffs do not suggest that the present residential zoning is inappropriate. What active land uses there are remain residential (with the exception of a dog kennel operated in connection with a house), substantially as they were at the time of the building of the highway. Apparently there has been little pressure for change and there has been no construction of any kind fronting the highway for a very long period of time. While two variances for office buildings on the north side were granted during the 1945–1955 period, one of which was allowed to the chairman of the board of adjustment, both were fortunately abandoned before construction began. Speaking more particularly, the south side of the highway frontage is blocked from private growth by complete state ownership thereof to a depth of 100 or 200 feet, with apparently no access through it. The land behind, some in

Mountainside and some in Westfield, has recently been developed with expensive homes which back upon the state-owned stretch. The mile of north side frontage consists of a relatively small number of parcels, a few vacant and the balance occupied by a dozen or so large, old homes, many almost in the estate class and most set well back from the road on large and beautiful tracts, whose owners are apparently content to continue their properties in exclusively residential usage.

Something should be said about the nature of housing development in Mountainside close to the highway, because of its bearing on the utility of the interior of plaintiffs' tract. In recent years a very large number of homes have been built on streets which parallel or intersect the highway, especially on the north side thereof and west of the restricted commercial zone. The rear or side of many of these homes is within 100 to 300 feet of the highway, generally separated therefrom by vacant highway frontage. As previously indicated, none have been built fronting the road. The evidence indicates that there has been a ready market for high class dwellings so situated, but apparently none for homes on the frontage. In other words, people are willing to live fairly close to the bustle, noise and dirt of the highway but not directly upon it. With more particular reference to plaintiffs' tract, the three non-highway sides are fully built up, commencing 100 to 200 feet north of the road, with substantial homes fronting on side streets and closely backing upon the boundaries of the tract. The approximate 900-foot depth of plaintiffs' parcel therefore results in a wide gore penetrating a fully settled residential area.

It should also be mentioned that the interior of plaintiffs' property originally sloped considerably upward from the grade of the highway comparable for the most part to the grade of the surrounding lands. Plaintiffs and their predecessor over the years removed the dirt making up the slope, so that now the entire tract is approximately at the highway level. The result is that the property is now substantially

bowl-like with banks 10 to 20 feet high on the three interior sides on the land above which sit the surrounding homes previously mentioned. There is access to the interior, other than from the highway, by a paper thoroughfare running through the bank from one of the surrounding streets.

What plaintiffs seek to do with the property, as shown by the variance application (a previous request to rezone the tract for the same purposes was refused by the borough governing body), is to utilize the whole for construction of a small shopping center. They propose to demolish the old orphanage building at the southwest corner and erect a 30,000-square-foot home furnishing store on its site, to build a two-story department store with a ground area of 50,000 square feet near the southeast corner fronting the highway, and another 30,000-square-foot building set back somewhere in between to house a restaurant, offices, bank or like use. The rear of the parcel would be laid out for a parking area to accommodate 1,000 cars of patrons and employees. A landscaped buffer strip along the interior lines at the foot of the bank is also included.

## I.

As precise discussion of plaintiffs' contentions is reached, attention is first directed to a collateral claim of procedural error in the Law Division action which arose in this fashion. At the original board of adjustment hearing on the variance application, plaintiffs' proofs were aimed to establish the right to a variance on a claim of unreasonableness of the use classification of their property (which proofs also later served as the evidence in support of their Law Division count to avoid the zoning) as well as on the basis of economic hardship in residential development of the tract arising from alleged peculiar characteristics of the property. The variance was strenuously objected to by residential property owners whose homes were near plaintiffs' tract or close to the highway in other sections. They were represented by counsel but offered

no opposing proofs. The board apparently did not have counsel to advise it. Some time after the Law Division action was commenced, in which, as we have said, a reversal of the variance denial was one aspect of the relief sought, the municipality moved to remand the matter to the board of adjustment for further proofs in opposition to the variance to be offered on behalf of the governing body. Apparently it was felt that some of the board's findings in denying the application might be considered improper ones (*i. e.,* a statement that the board was familiar with the property and area without setting forth on the record the details of that knowledge and the setting forth of the irrelevant reason for denial that no showing had been made of local need for the commercial development proposed by plaintiffs) or that other findings might not be sufficiently supported by the record. The remand was allowed by the trial court over plaintiffs' objection of impropriety in allowing a case in opposition to the variance thus to be made after the administrative proceeding had been closed and determined. The remand resulted in extensive further hearings, at which the board was advised by its own counsel, with voluminous opposition testimony offered by the borough attorney. At the conclusion the variance was again denied with new findings which did not contain the deficiencies that might have been urged with respect to the first determination. Plaintiffs urge that this court disregard the opposition evidence introduced at the further hearings and review the denial of the variance only on the basis of the proofs presented to the board at the original hearing.

■ The point is really an academic one because we are satisfied, as will later be mentioned more fully, that plaintiffs did not sufficiently establish a valid basis for a variance on their own proofs at the original hearing and so the opposition testimony at the further hearings was not harmful to them. Moreover, most of that testimony bore on the issue of the intrinsic reasonableness of the ordinance use classification of the property and undoubtedly would have been presented at the trial on that issue even if it had never been offered before the board.

(In fact a large part of it was reintroduced by live repetition at the trial.) Consequently the effect of the remand was really only unfortunate further delay in an already protracted litigation.

The discretionary power in a court to remand an administrative action under review for further proceedings by the agency in the interests of justice is unquestionable. *New Jersey Turnpike Authority v. Jersey City,* 36 *N. J.* 332, 340 (1962). Most of the remands which have been ordered in zoning variance cases have been in situations where the agency *granted* relief and the court desired further findings by the agency or further evidence to support the findings made. It is at least unusual to remand on application of an opponent of a variance to permit the presentation of a new case in opposition where the agency *denied* relief. Protection of the public interest may justify such a course in particular situations as an appropriate exercise of judicial discretion. As a matter of hindsight this remand was unnecessary and proved only dilatory. Perhaps even at the time it was unwise to grant it, but we cannot conceive that any actual prejudice on the merits resulted to plaintiffs and it is certainly no ground for reversal of the trial court's judgment.

## II.

### (A)

We turn to plaintiffs' contention that Mountainside's scheme of highway land use control prior to, and even under, the 1955 ordinance, is illegal as amounting to zoning by administrative control contrary to the requirements of the enabling act. *N. J. S. A.* 40:55–30, *et seq.* The result apparently suggested is *ipso facto* nullification of the highway use classifications, at least to the extent of the limitation to residential use still imposed by the 1955 ordinance on the segment in which plaintiffs' property is located running from the end of the restricted commercial zone to just beyond the New Providence Road intersection.

██ The point is, of course, based on the pre-1955 course of conduct involving blanket zoning of the town's entire highway frontage exclusively for residential use, which could not be sustained *in toto,* and indiscriminate granting of numerous variances for business and industrial uses. The position is so obviously correct insofar as the situation up to 1955 is concerned that the municipality concedes as much and little time need be spent in discussion of it. The statute requires zoning by districts, in accordance with a comprehensive plan, under uniform regulations for each class or kind of use throughout the district, imposed with reasonable consideration to the character of the district and its peculiar suitability for particular uses. *N. J. S. A.* 40:55-30, 31 and 32. *Rockhill v. Chesterfield Township,* 23 *N. J.* 117 (1957). The legitimate function of the use variance authorized by *N. J. S. A.* 40:55-39(d) is that of sparing application only to relieve the occasional individual property from validly based general limitations of the ordinance for special reasons. *Cf. Andrews v. Ocean Township Board of Adjustment,* 30 *N. J.* 245 (1959). It is the antithesis of the statutory requirement to impose blanket use restrictions without regard to the character of the district and use suitability and then generally and indiscriminately permit innumerable contrary uses by administrative action. Such a course of administrative control implicitly recognizes that the blanket ordinance restrictions cannot be justified. The scheme here utilized up to 1955 was even worse than that struck down in *Rockhill, supra* (23 *N. J.* 117) where an analogous method was at least expressly articulated and provided for in the ordinance. If the 1955 ordinance had not been adopted, we would have no hesitancy in completely nullifying the prior provisions limiting highway frontage to residential use and requiring the borough to rezone the entire area in compliance with the statutory criteria.

██ But the 1955 ordinance recognized, by its creation of the highway industrial and restricted commercial zones, that restriction to residential use in the sectors covered thereby was no longer proper. And we agree with the trial court

that there is no sufficient evidence to support plaintiffs' claim of continuance since that time of the former practice of indiscriminate variance allowance in the sections of the highway where the residential classification was retained. Only three highway variances have been granted since 1955. One was to permit enlargement of the borough hall in violation of sideyard requirements, another to sanction construction of the rescue squad building because of doubt whether it was strictly a public structure allowed by the ordinance in a residential zone, and the· third, in 1957, covered the office building just west of the New Providence Road intersection which was built between a filling station and a restaurant to replace a deteriorated dwelling. The first two would not merit condemnation under the pre-1955 practice; the third, perhaps appropriate because of its situs, on the thesis that retention of the residential classification in the segment is justified, does not, standing alone as it does, evidence continuance of the prior wrongful course of action. Plaintiffs' present contention is, therefore, factually unsupported and is without merit so long as the municipality refrains from reverting to its pre-1955 ways.

### (B)

At this point we may well consider a further claim representing another aspect of the contention of land use regulation by administrative control in violation of enabling act requirements. This claim seeks a declaration that certain special regulatory provisions, found in section 9 of the 1955 zoning ordinance (which incidentally had their origin in the previous ordinance) and identically in Article IX of the planning board ordinance, applying to the establishment of any business, commercial or industrial use are invalid. The contention is an abstract one and we do not choose to pass upon it definitively here, since we are holding that plaintiffs are not entitled to use their premises for the proposed business enterprise and therefore the regulations objected to can have

no present application to them. Nonetheless, the general importance of the matter and the fact that it was specifically ruled upon by the trial judge make it desirable for us to express some tentative and limited observations.

The provisions in question require that no person may commence or enlarge the operation of any business or industry in Mountainside or change the location of one previously established until permission has been issued by the secretary of the planning board. Such permission is to be obtained on written application to and favorable action by the planning board. The application must include building and plot plans and a detailed description of the operations to be performed, prospective number of employees, type and numbers of machines and equipment to be operated, products to be manufactured or sold, and estimated amounts of water to be consumed and the volume of sewage and incoming and outcoming vehicular traffic. (The applicant may appeal to the governing body in the event of unfavorable board action.)

The scope of and criteria governing board consideration are best described by verbatim recital of one paragraph of the section:

"No permit for the operation of such business or industry shall be issued until the Planning Board has approved such business or industry. Upon written request for a hearing made by the applicant to the Planning Board an opportunity to be heard shall be granted to the applicant within thirty (30) days thereafter. The Planning Board, in considering and reviewing the application, including all information submitted by the applicant, and in arriving at its decision, whether a hearing shall be requested or not, shall be guided by, and take into consideration, the public health, safety and general welfare, and shall give particular consideration to the following factors:

(a) Present and future anticipated consumption of water and volume of sewage.

(b) Concentration of traffic in vicinity of business or industry.

(c) Available facilities for parking.

(d) Present or potential fire hazard.

(e) Possibility of creation of a public nuisance due to odor, dust, smoke, noise or objectionable illumination.

(f) Possibility of unusual hazards.

(g) Land values and uses.

(h) Architectural style and design in relation to existing commercial and industrial buildings.

(i) Such other factors as may bear upon or relate to a coordinated, adjusted and harmonious physical development of the premises in question with surrounding lands and buildings and with the master map of the Borough of Mountainside.

If after examining the application and all information submitted by the applicant, and after hearing, if one be requested by the applicant, the Planning Board shall be of the opinion that the proposed location or relocation of said business or industry will not create conditions inimical to the public health, welfare and safety, nor obstruct the proper development of the premises in question in conjunction with the surrounding lands and buildings, according to the master map of the said Borough, will not result in present or future excessive consumption of water or excessive sewage, concentration of traffic in the vicinity of the business or industry, create present or potential fire hazard, create a public nuisance due to odor, dust, smoke, noise or objectional illumination, create unusual hazards, or be detrimental to or impair land values and uses, will provide satisfactory parking facilities and result in an architectural style and design in harmony with existing commercial and industrial buildings, permission to operate said new business or industry or to relocate said business or industry shall be granted to the applicant by the said Planning Board."

The regulations are obviously intended to impose additional restrictions where the general character of the proposed use is expressly permitted at the location by use classification provisions of the ordinance. Plaintiffs contend that the considerations specified are so broad, go so far and, in any event, do not set forth adequate standards, that administrative control of the establishment of a business or industry on a capricious and illegal basis must necessarily result and that the situation will be as legally bad as the pre-1955 course of action. The municipality urges—and the trial judge found them valid in entirety on this basis—that the regulations are intended to go no further than the device of site plan approval and the like by the planning board under *N. J. S. A.* 40:55–1.13 held proper in prior decisions. See *Kozesnik v. Montgomery Township*, 24 *N. J.* 154, 178, 184–186 (1957); *Newark Milk and Cream Company v. Parsippany-Troy Hills Township*, 47 *N. J. Super.* 306, 332–333 (*Law Div.* 1957); and compare *Brundage v. Township of Randolph*, 54 *N. J. Super.* 384, 395 (*App. Div.* 1959), affirmed o. b. 30 *N. J.* 555 (1959). The municipality obviously refers particularly to

the method therein approved of delegating to the planning board, rather than the building inspector or some other agency, the task of deciding whether legitimate land use control considerations are met on the basis of sufficient standards contained in the zoning ordinance. A pertinent example here is assurance that manufacturing operations will meet the ordinance standard of not producing "injurious or offensive noise, fumes, smoke, odor or vibrations," the detailed requirements of which as to every conceivable enterprise may well be thought incapable of exact advance specification in the ordinance.

If the provisions of this section are to be interpreted to mean that this, plus general site plan approval as defined in the cited cases and assurance of compliance with any other applicable detailed provisions contained in other sections of the ordinance, e. g., parking and loading facilities, were all it is to encompass, it seems valid enough. (There is nothing in the record to indicate how the provisions have been construed or applied in practice.) But the face of the quoted paragraph in the considerations and criteria there specified as governing board action seems to go much beyond and we find this statement in defendants' brief: "The ordinance in question recognizes that the business use is allowed in the area in question but that it will be allowed only provided it does not interfere with the public health, welfare and safety of the community." Without now going into details, this appears to open Pandora's box and offers the possibility of inquiring into and denial of the right to establish an individual business, otherwise authorized by the ordinance, for reasons which may well have no valid connection with legitimate land use control under the present statutory scheme and, at the least, not protected by sufficient standards. While we have serious doubts in the abstract as to validity to the full extent of the considerations and criteria set forth in the section, we prefer to await a case directly involving the application of the regulations before expressing a definitive opinion.

## III.

This brings us to the pivotal question of the reasonableness, in the constitutional sense, of the continued zoning of plaintiffs' property against business use. It is crucial in our minds that the claim is made and relief desired only on the basis of the entire 12 acres. Plaintiffs' argument is presented on the thesis that unreasonableness as to the highway frontage infects the entire 900-foot depth. This is clearly not so under the proofs. We perceive a vast difference as to that large portion of the tract to the rear of the part covered by the variance and the 100-foot-deep state-owned strip, irrespective of the reasonableness of the use classification of the frontage. To put it shortly, there is just no evidence to support the proposition that the interior of plaintiffs' land is unsuitable, in the context of constitutional reasonableness, for the residential use prescribed by the ordinance. Indeed, plaintiffs' own proofs confirm this conclusion. Furthermore, the interior of the tract deeply penetrates a fully developed, high-caliber residential section which would unquestionably be harmed to a very considerable degree by commercial use of the whole parcel. Consequently, since plaintiffs seek relief on the ground of unreasonableness only as to the tract in its entirety, we conclude that their demand must be denied *in toto*.

We have intimated that a far different and much harder question would be presented if the reasonableness point were confined to the highway area encompassed by plaintiffs' current variance. We think that we should make some comment thereon because the municipality's theory of defense, substantially adopted by the trial judge in reaching the same result we do, proceeded on the basis of valid present limitation to residential use of all the highway frontage from the end of the restricted commercial zone to the Scotch Plains boundary, as if to secure a judicial holding to that effect. We have so much question of the soundness of the basis urged that we do not

want this opinion to be construed as deciding the question one way or the other.

 Analysis of the municipality's thesis, built largely upon the expert testimony of a municipal planner, discloses several aspects, many of considerable importance on the very troublesome question of through highway zoning generally. The first aspect asserts that the extended frontage just referred to has a predominantly residential character and utilizes an arithmetical method of proof by totalling the front foot usages in various categories. The trouble here is that a distorted picture is painted and the character difference shown by the evidence between the segment running from the end of the restricted commercial zone through the several business enterprises just beyond the New Providence Road intersection and the segment west thereof is not recognized as it seems it should be. Areas as distinct as these two are today require at least separate consideration, if not separate treatment. As our earlier analysis of the facts demonstrates, the land uses in the segment in which plaintiffs' frontage is located are not predominantly residential any longer and the use pattern there does not follow that prescribed by the ordinance. Secondly, it is urged that the use classification in the vicinity of plaintiffs' property is rendered valid because it is in accordance with the municipality's comprehensive plan. That plan is said to envision a predominantly residential community, with business and industry confined to areas specified by the ordinance and highway development otherwise closely restricted in order to have as little detrimental effect as possible on the residential characteristics of the community. This is all very well, but it is elementary that every district use classification is not saved simply because it is part of a comprehensive community plan. The plan to be a valid and effective influence in support of zoning regulations must not be a capricious one and its existence will generally not *ipso facto* insulate from scrutiny or invalidity the use classification of a substantial area which is established to be realistically unreasonable. We suggest that, while there may be sound bases to sustain the use classi-

fication in the area in question, the two just discussed are not too convincing.

Implicit in the municipality's thesis seems to be the deeper thought that further business use along a through highway may be prohibited for the sake of seeking thereby to prevent a bad traffic situation or an ugly roadside from becoming worse, even if, as seems clear from the evidence here, the only permitted use (residential) is so practically unlikely to be utilized that the result will be the deterioration of existing dwellings and the zoning of vacant highway frontage into permanent idleness. To put the idea in another way, may a municipality which had no early valid plan of regulation and with the hodgepodge highway strip development and land use control history of Mountainside validly say that it has had enough, even though abutting highway owners, particularly holders of vacant land, may end up with only the expensive privilege of paying taxes? *Cf. Fanale v. Hasbrouck Heights*, 26 *N. J.* 320 (1958), where, however, it would appear that remaining permitted uses were feasible. Or when a situation has gone so far to the bad, is it legally impossible to halt its further development completely? The questions are intriguing and most difficult, involving many public and private interests of vast consequence. We do not attempt to answer them here, beyond the observation that it seems unlikely a court would allow a municipality to repent of its past sins completely at the expense of the abutting highway land owner. Perhaps the best answer to frontage use problems on unlimited access highways is governmental acquisition of adjacent vacant strips, as has occurred in several points in Mountainside (although the record is not clear that these acquisitions were made for this purpose).

## IV.

 Finally we come to plaintiffs' claim that they were wrongly denied a variance for the entire tract. The answer is clear. The board of adjustment was eminently correct in

refusing to recommend it and the Law Division equally so in upholding the board. The matter is so plain that a contrary result could not be sustained as a proper exercise of board authority.

Plaintiffs offered two alleged "special reasons," *N. J. S. A.* 40:55-39(d), to support their application. On their own proofs, neither reason alone, nor the two in combination, was established to be sufficient. The first was the claim of intrinsic use classification unreasonableness of the tract as a whole, which we have already rejected as factually without merit. The second projected certain peculiar physical characteristics of the tract which it was urged would make residential development more difficult. The reason is summarized in plaintiffs' reply brief:

"* * * the plaintiffs do not claim that there is any physical impossibility of constructing one family houses, but that it is economically unfeasible to develop the property for one family houses because the shape and location of the tract, the surrounding development of streets, the stream crossing the property, etc. would make development highly expensive whereas the proximity to the highway makes the property less desirable for one family residence and less salable and the combination of factors would price the developed property out of the market."

The claim is really one of inability to make as much money as if commercial development were permitted, for the proofs did not sufficiently show that development costs would be excessively high on a competitive basis or that houses which might be built on the tract could not be sold at some profit. It is fundamental that mere economic hardship of these limited dimensions is not a sufficient special reason to ground a variance. See *e. g., Home Builders Association of Northern New Jersey v. Borough of Paramus,* 7 *N. J.* 335, 343 (1951).

█ Moreover, as the board of adjustment rightly found from the evidence, the additional negative criteria required by *N. J. S. A.* 40:55-39, *i. e.,* that the relief could be granted without substantial detriment to the public good or substantial impairment of the zone plan and ordinance, were certainly

not met. The proofs clearly established the contrary. *Schoelpple v. Woodbridge Township,* 60 *N. J. Super.* 146 (*App. Div.* 1960).

■ We feel we ought to speak additionally on the argument of defendants that a proper reason, sufficient in itself, to deny the variance in this case is that plaintiffs bought the property knowing it was zoned for residential purposes and therefore may not assert hardship as a variance reason. The suggested theory is that purchase with such knowledge amounts to a self-created hardship.

There is a good deal of general and loose language in our earlier cases which we believe has led to confusion and misconception with respect to the factual situation posed and which demands clarification. For example, the following is found in *Ardolino v. Florham Park Board of Adjustment,* 24 *N. J.* 94, 106 (1957):

"In the evaluation of a claim of undue hardship, the purchase of land after the adoption of an ordinance prescribing a greater requirement than can be complied with is a circumstance to be considered, *Beirn v. Morris,* 14 N. J. 529, 535 (1954). It is not conclusive by any means, but it is unquestionably a material element bearing on the issue, *Lumund v. Board of Adjustment of the Borough of Rutherford,* 4 *N. J.* 577, 581 (1950) and weighs heavily against the plaintiffs' claim, *Home Builders Ass'n. of Northern New Jersey v. Paramus Borough, supra,* 7 *N. J.* 335, 343 (1951)."

But as that case went on to point out, in considering the concept in relation to the particular facts, the quoted language is not to be applied automatically to deny relief on that ground alone where nothing had been done by the owner or his predecessors, after the adoption of the ordinance provision in question, to create the condition as to which variance relief is sought on the basis of hardship.

We wish to make it clear that if a prior owner would be entitled to such relief, that right is not lost to a purchaser simply because he bought with knowledge of the zoning regulation involved. This situation is not within the realm of the self-created hardship which will generally bar relief. As is

said in 2 *Rathkopf, Law of Zoning and Planning* (*3d ed.* 1960), *c.* 48, *p.* 48-20:

"Despite the fact that some courts have used language which, taken upon its face, would indicate that even where a unique hardship existed with respect to land which would have warranted the person owning that property prior to the enactment of the ordinance to apply for and receive a variance, the mere act of purchase with knowledge of the ordinance bars the purchaser from the same relief, it is apparent that few higher court decisions have actually so decided. In each case in which the refusal of a variance was upheld and in which such language was used, the facts showed either that there was an affirmative act which created the hardship peculiar to the property involved or that there was not sufficient evidence that the property was not reasonably adapted for a conforming use."

Perhaps we ought also to say out of an abundance of caution, that the disposition of this case shall not prejudice, in either direction, any future application or action by plaintiffs seeking relief with respect to the highway frontage encompassed by the current variance, either by way of modification of the present limitations of that variance as to building and precise use or otherwise.

The judgment of the Law Division is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For reversal*—None.