The ANACONDA COMPANY, a Montana
corporation, Plaintiff,

v.

William D. RUCKELSHAUS, Administra-
tor of the United States Environmental
Protection Agency, et al., Defendants.

Civ. A. No. C-4362.

United States District Court,
D. Colorado.

Dec. 19, 1972.

Holland & Hart, Denver, Colo., by Harry L. Hobson, Wichita, Kan., Robert T. Connery and R. Brooke Jackson, Denver, Colo., for plaintiff.

Charles W. Johnson, Asst. U. S. Atty., Denver, Colo., James Glascoe, U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

WINNER, Judge.

The matter is before the Court on plaintiff's application for a preliminary injunction, and the controversy will have to be finally resolved when ripe for decision in final hearing on a permanent injunction. It is intended that this opinion serve as the findings of fact and conclusions of law required by Rule 52, and fact findings are set forth throughout the body of the opinion.

However, as a prefatory matter of housekeeping, although some of the enumerated facts are discussed more fully later herein, the following enumerated facts are found, based upon the stipulation of the parties or on the evidence received in the case:

1. Plaintiff is a Montana corporation with a principal place of business at Anaconda, Deer Lodge County, Montana.

2. Plaintiff operates a copper smelter at Anaconda, Montana. That smelter is the only significant source of sulphur oxides in Deer Lodge County.

3. William D. Ruckelshaus is the Administrator of the United States Environmental Protection Agency with offices in Washington, D. C.

4. John A. Green is the Region VIII Administrator of the United States Environmental Protection Agency.

5. Leonard W. D. Campbell is General Counsel for Region VIII of the Environmental Protection Agency and is a duly appointed and acting member of the Hearing Board for Region VIII which was granted authority to make procedural rulings and hold hearings with respect to a control strategy for plaintiff's copper smelter. The Hearing Board, along with the Air Programs Division, evaluate the hearing record and make recommendations as to what was proved or disproved at the hearing concerning the proposed rule to the Regional Administrator of E.P.A.

6. Irwin L. Dickstein is Director of Enforcement for Region VIII of the United States Environmental Protection Agency and is a duly appointed and acting member of the Hearing Board with responsibilities as described in the preceding fact.

7. Charles Murray is Director of Air and Water Programs for Region VIII of the United States Environmental Protection Agency and is a duly appointed and acting member of the Hearing Board with responsibilities as described in Fact No. 5.

8. Green, Campbell, Dickstein and Murray are all residents and citizens of the State of Colorado with offices at Denver, Colorado.

9. Region VIII of the United States Environmental Protection Agency is made up of the States of Colorado, Montana, North Dakota, Utah and Wyoming.

10. On January 8, 1972, the Montana State Board of Health held a hearing on its proposed implementation plan for the State of Montana as required by § 110 of the Clean Air Act, 42 U.S.C. § 1857c–5.

11. Plaintiff was present at the hearing on January 8, 1972, and tendered evidence with respect to the proposed control strategy for sulphur oxides from its copper smelter, much of which tendered evidence was not admitted and was excluded from the record by Dr. John Anderson. The transcript of that hearing was attached to the stipulation of the parties, and it has been received in evidence in this case.

12. Dr. John Anderson, Director of Montana's Department of Health and Environmental Sciences excluded the tendered testimony and exhibits by written order on the ground that they were "irrelevant to the hearing." The letter announcing such order was attached to the stipulation and has been received in evidence.

13. The "Implementation Plan for Control of Air Pollution in Montana," §

IV(F) at page 25 recites that "The underlying philosophy in the Montana regulations is to require control consistent with the most advanced 'state of the art,' "—a standard quite different from the federal primary air standard for sulphur oxides.

14. On March 22, 1972, the Governor of the State of Montana submitted the State of Montana's Implementation Plan to the Administrator of the Environmental Protection Agency for approval or disapproval as required by § 110 of the Clean Air Act Amendments of 1970. The Governor deleted the portion of the Implementation Plan relating to a control strategy for sulphur oxides from nonferrous smelters.

15. On May 31, 1972, the Administrator of the Environmental Protection Agency disapproved certain aspects of the State of Montana's Implementation Plan including its failure to provide a control strategy for sulphur oxides from nonferrous smelters in Montana.

16. On July 27, 1972, the Administrator proposed an implementation plan for control of sulphur oxides from plaintiff's smelter in Montana pursuant to § 110(c) of the Clean Air Act. This is set forth in Federal Register, Volume 37, No. 145, at page 15102, and from it stems this lawsuit.

17. The proposed implementation plan contained an emission limitation on sulphur oxides which is only applicable at the present time to plaintiff's copper smelter sulphur oxide emissions at Anaconda, Montana; moreover, it is inconceivable that the plan will or can, ever apply to any other emission source.

18. The proposed emission limitation was, in part, based on specific emission data with respect to plaintiff's copper smelter which data was requested by E.P.A. by letter dated March 30, 1972.

19. The proposed plan limits the emissions of sulphur oxides from plaintiff's smelter to 7,040 pounds per hour regardless of the rate of copper production, and, seemingly, regardless of the percentage pollution of the ambient air, or the size or efficiency of the smelting operation. [As will be discussed later, the applicable ambient air standard is keyed to percentage of pollution rather than to rolled back pounds of emission at the stack.]

20. The plan proposed originally by the Montana Department of Health and Environmental Sciences would have provided for a ninety percentage retention rate of emissions rather than a fixed number of pounds per hour, but this portion of the plan was deleted by the Governor.

21. On August 18, 1972, the Administrator of E.P.A. published in the Federal Register a notice of public hearings to be held on August 30, 1972, in Helena, Montana, on the proposed emission limitation.

22. By letter dated August 19, 1972, plaintiff demanded an adjudicative hearing on the proposed emission limitation including the right to subpoena witnesses and to cross-examine and confront witnesses.

23. By letter dated August 23, 1972, John A. Green denied plaintiff's request for an adjudicative hearing on the proposed emission limitation. Plaintiff was denied the right to subpoena witnesses and was denied the right to cross-examine or confront E.P.A.'s witnesses to inquire into the factual basis for the proposed emission limit.

24. Plaintiff appeared at the hearing on August 30, 1972, and again requested the right to subpoena specific witnesses and to cross-examine and confront specific witnesses relating to the basis of the proposed emission limitation for its copper smelter. Leonard W. D. Campbell, acting for the hearing panel, denied the request.

25. At the hearing on August 30, 1972, representatives of E.P.A.'s Region VIII presented evidence that the proposed emission limitation of 7,040 pounds per hour from the stack for plaintiff's copper smelter was calculated entirely on a single 24-hour ambient air quality sample taken by the Division of

Air Pollution Control of the State of Montana between 3:00 P.M. on October 26, 1971, and 3:00 P.M., on October 27, 1971.

26. At the August 30, 1972, hearing, the Hearing Board cross-examined all of plaintiff's witnesses and other witnesses while denying plaintiff the right to cross-examine any witness including testifying personnel of E.P.A.

27. No environmental impact statement has been prepared or made public by the Environmental Protection Agency concerning the proposed emission limitation on plaintiff's copper smelter. Nor has the agency considered (nor will it consider) alternatives or possible adverse effects of the proposed rule on (a) other aspects of the environment, (b) the economy, (c) national defense, or (d) the public welfare.

28. The 24-hour ambient air sample upon which the proposed emission limitation is based was taken with a Beckman 906–A ambient air sampling instrument which had not been calibrated and which was not functioning properly.

29. The State of Montana discarded as unsound and unreliable the readings made by the instrument between October 13, 1971, and October 24, 1971, as indeed it should have, in light of the fact that the upwind readings were several times higher than the downwind readings. Nevertheless, the hearing panel accepted uncorrected readings.

30. The State of Montana did nothing to repair or recalibrate the instrument during the period from October 24, 1971, through October 27, 1971, and yet accepted as sound and reliable the reading made by the instrument for the period October 25 through October 27, 1971.

31. The instrument making the 24-hour maximum reading upon which the proposed emission limitation was based was located more than 5 miles from Anaconda's copper smelter stack.

32. Expert meteorologists for Anaconda testified without contradiction at the August 30th hearing and the Court finds that the sulfur oxide concentrations allegedly being measured by the upwind sampling station were not and could not have been due to the emissions from plaintiff's copper smelter.

33. Anaconda demonstrated on the basis of its own scientific studies and other evidence which was not contradicted at the August 30th hearing that retention of no more than 40% of the sulfur oxides emitted by its copper smelter would be adequate to attain and maintain federal primary and secondary ambient air quality standards—standards quoted in full *infra*, which in fact seem to have little or no true relationship to the proposed rule.

34. The proposed emission limitation would require at least an 89% reduction in plaintiff's sulfur oxide emissions, a far greater limitation than seems to be necessary under the federal primary ambient air standards.

35. E.P.A. acknowledges that such a reduction in plaintiff's sulfur oxide emissions is not now possible through reasonably available control technology.

36. Plaintiff is currently engaged in a multi-million dollar program for air pollution control facilities designed to achieve the 40% reduction above referred to—i.e., designed to meet the federal standards, albeit the meeting of federal standards by Anaconda is of little interest to defendants.

37. It appears probable that an additional expenditure of 60 million dollars would be required in order to achieve the degree of emission reduction called for by E.P.A.'s proposed emission limitation if in fact such emission limitation can be obtained under any known technology, and the Court makes no finding as to whether this is or is not possible, although it is to be hoped that such a finding can be made when all of the evidence is received on final hearing.

38. Nearly 16 million dollars of the multi-million dollar program would be wasted if Anaconda is required to attempt to comply with the E.P.A.'s proposed emission limitation, because Anaconda's expenditures aimed at compli-

ance with the published federal primary ambient air standard would accomplish nothing if it be ordered to comply with the 7,040 pound per hour standard.

39. Compliance with the Administrator's proposed emission limitation would create additional pollution problems including problems of water pollution, solid waste disposal problems and air pollution problems having to do with the quarrying, transportation and the hauling of limestone and other similar materials. These problems are directly related to the resultant production of a staggering quantity of unsalable sulfuric acid which would threaten water pollution. None of these problems has been studied or considered by the Administrator or by any member of his staff.

40. As is more fully hereinafter discussed, the proposed emission limitation is aimed at plaintiff, and plaintiff only.

41. One of defendants' expert witnesses admitted, and the Court finds, that there was room for sixty (60) percent error in the conclusions on which the proposed rule is based—a margin for error which may well prove that Anaconda's plans will meet published federal standards.

42. Irreparable harm will result to plaintiff from the delay encountered by awaiting other means of review of the administrative action.

43. The Administrator, acting for an agency of the United States, initiated and participated in the proposed emission limitation, and the government will at least allegedly benefit from that limitation.

It is to be emphasized that these findings and conclusions are made on the resolution of an application for a preliminary injunction, and that they are subject to the teachings of Atomic Oil Company of Oklahoma v. Bardahl Oil Company (1969) 10 Cir., 419 F.2d 1097; Continental Oil Company v. Frontier Refining Company (1964) 10 Cir., 338 F.2d 780; United States v. Brown (1964) 10 Cir., 331 F.2d 362; and Crowther v. Seaborg (1969) 10 Cir., 415 F.2d 437.

See, Colorado Labor Council v. American Federation of Labor-CIO (1972), D.C. Colo., 349 F.Supp. 37, for my thinking on preliminary injunctions.

With these introductory findings and conclusions, it should be, and it is noted, that jurisdiction is vigorously contested by the defendants here, and the jurisdictional question will be discussed presently.

Defendants say, *inter alia*, that the hearing which is the underlying subject of this lawsuit is legislative or rule-making in its nature and that no due process of law is required. They additionally urge that review of any improprieties in that hearing must be by way of Section 307 of the Clean Air Act, and that only the Ninth Circuit has jurisdiction somewhere down the road to review defendants' actions.

 I agree, and in fact I agree emphatically, that ordinarily the typical requirements of due process of law form no part of a rule-making hearing, and I agree emphatically that ordinarily a person is not entitled to any adjudicatory hearing when the purpose of the hearing is one of rule making. Citation of authority in support of this hornbook principle is not necessary. However, there are certain well delineated exceptions to this general principle, and I think that this case falls squarely and undeniably within those exceptions. To determine whether or not an adjudicatory hearing is or is not required cannot be decided upon the basis of any single test. Generally two tests are said to be of primary importance. First, one must answer the question: Is the action aimed at a single individual or company? Secondly, one must determine whether adjudicative facts form the basis for the proposed action. Emphatically both of those tests are met here. The so-called rule which is under consideration has to do with emissions of sulphur dioxide in Deer Lodge County, Montana, in a quantity of 7,040 pounds per hour. There is one and only one company at which this so-called rule is directed and that is the only company it

can be directed at within the foreseeable future. This is a special rule. It is a single shot attack, aimed at the plaintiff and only at the plaintiff, and plaintiff's rights cannot be destroyed without due process of law under the guise of rule making.

Passing now to the second test, the record made in this case demonstrates that the proposed rule is dependent almost in its entirety on bitterly contested factual issues applicable to the only smelter in Deer Lodge County, Montana. The very cross-examination which was not permitted in the administrative hearing would have established (as it did at time of trial) that the proposed rule is dependent upon a determination of contested facts. Good faith consideration of the information which was brought out on cross-examination in this Court might well change the provisions of the proposed rule, but the vital cross-examination was not permitted.

■ By way of explanation it is to be noted that the adjudicative facts in their inception stem from the earlier hearing held before the Montana Board of Health. It is apparent from the record which has been received in evidence here that at that hearing Anaconda appeared and attempted to present its side of the case. The Montana officials ruled that Anaconda's proffered evidence was not relevant and would not be received. It was not received because the Montana officials thought the federal ambient air standards were not controlling. Now, defendants say they don't have to hold a hearing because the state had one. The argument won't fly. The Montana hearing rejected Anaconda's evidence as irrelevant, and somewhere along the way Anaconda is entitled to have its evidence at least considered.

Thereafter, the Montana officials came up with a regulation which may effectively put plaintiff out of business, and in accordance with applicable law,

the control strategy recommended by the Montana officials was forwarded to the Governor of Montana to be by him sent to the appropriate federal officials.[1] However, he deleted the section of the plan having to do with the control of sulphur dioxide and sent the plan on without that provision in it. Thereafter, defendant Ruckelshaus disapproved the Montana plan because of that very deletion. This laid the groundwork for the so-called hearing which was held in Montana on August 30th, before the defendants Campbell, Dickstein and Murray.

■■ Of course, at that hearing no witness testified under oath. The ground rules promulgated by the defendant Campbell demonstrate clearly the fashion in which the hearing was to be conducted, and the transcript reflects that it was indeed conducted strictly in accordance with those ground rules which were a far cry from making provision for the minimal due process required in an adjudicatory hearing. The evidence in our trial conclusively demonstates that the instrument readings on which the proposed rule is based are totally fallacious, and the evidence conclusively demonstrates that the testing instruments were not in proper operating condition and that they had not been calibrated. Yet, Anaconda was not permitted to cross-examine on this or any other subject essential to the promulgation of a fair and reasonable rule. By cross-examination during trial, many pertinent facts have been developed, but Anaconda should have been permitted to develop them during the administrative hearing for consideration by the hearing panel. Defendants belatedly adopted the singular position that the facts developed at trial will now be considered by them in formulating the rule aimed at Anaconda. Thus, defendants offer to cure their own omissions by consideration of facts forced upon them by the cross-examination permitted in this case

---

1. The validity of the Montana regulation is not before us, but Anaconda has promised that the state's rule will be challenged in the Montana courts. The resolution of that challenge we leave to those courts.

but denied in the administrative hearing. The difficulties with this novel position adopted by defendants are manifest, but numbered among them are the difficulty of incorporating the record in our trial in a possible later review by the Ninth Circuit under Sec. 307 of the Clean Air Act, and the glossing over of the proposition that many more pertinent facts may be brought out if the witnesses are put to the test of the crucible of cross-examination in the administrative hearing. Defendants additionally say that, after all, Anaconda was permitted to present its own witnesses at the administrative hearing—witnesses cross-examined by the hearing panel—and that this is all Anaconda is entitled to. Suffice it to say that one sided cross-examination is not our concept of due process. If the dispute eventually reaches the Ninth Circuit for its review, we suspect that the Court would like to have both sides of the story before it.

An analysis of the entire record demonstrates that defendants claim an awesome power over the very life of a publicly held corporation having thousands of stockholders and employees. They claim the awesome power to destroy that corporation by virtue of a "rule" adopted at a non-adjudicatory hearing. They claim the awesome power to destroy the stockholders' investment, the frightening power to render jobless thousands of company employees, and the terrifying power to destroy the economy of a city and an important segment of the economy of a state—all without an adjudicatory hearing. The approach is totalitarian rather than democratic.

■ Moreover, defendants freely admit that they gave no consideration to the possibility that a court might someday rule that their action constituted a taking without payment of just compensation, and they gave no consideration to the possible exposure of the public purse to a claim of $100,000,000 in an inverse condemnation suit. In fact, defendants

say that Congress has directed that no consideration can be given to this or other related questions. Congress has been maligned over the years, but I do not believe that Congress intended in the Clean Air Act to mandate that in enacting air standards no consideration could be given to the nation's economy, to its national defense, to our balance of payments,[2] to the general welfare, or to the possible destructive cost of the payment of just compensation if courts were to hold that the proposed "rule" constituted a taking. To find any such intent on the part of Congress would require a much clearer statement of that intent than I find in the statute. Emphatically, this opinion is not to be construed as a prejudgment of the "taking" question, but the problem exists, and good judgment dictates that it should not be ignored in cavalier fashion. Its complexity and uncertainty is discussed in City of St. Paul v. Chicago, St. Paul, Minneapolis and Omaha Railway Company (1969), 8 Cir., 413 F.2d 762. Defendants' approach to the matter is that we need clean air, and no one disagrees with that. But, the question may become, "Who is to pay the piper?"

It should be remembered that Mr. Justice Holmes said in Pennsylvania Coal Co. v. Mahon (1922) 260 U.S. 393, 43 S. Ct. 158, 67 L.Ed. 322:

". . . The protection of private property in the Fifth Amendment . . . provides that it shall not be taken for [public] use without compensation. . . . When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

. . . . . .

"We are in danger of forgetting that a strong public desire to improve the

2. It is implicit in the transcript of the Montana hearing that the suggested solution is to have all copper smelted in foreign countries.

public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

Nor should the frequently quoted case of Berman v. Parker (1954) 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27, be overlooked. In addressing himself to that which is now popularly described as "sight pollution," Mr. Justice Douglas said:

"If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way."

However, he quickly added:

"The rights of these property owners are satisfied when they receive that just compensation *which the Fifth Amendment exacts as the price of the taking.*"

This brings us full circle, and we repeat that we do not think that Congress directed that cost should be totally ignored by the E.P.A. in its determination of the Clean Air Act. We do not think that Congress intended to give an untried bureaucracy a blank check coupled with a direction that cost must not be considered. We have too much respect for the business judgment of Congress to accept this interpretation of the Clean Air Act, but such is defendants' position here. We do not think that it is asking too much to require that the E.P.A. at least give consideration to the costly as well as the beneficial factors involved in its proposed rule even if we accept (and we have difficulty in accepting) the proposition that Congress delegated to E.P.A. hearing panels the authority to "take" property at possible government expense. By no stretch of the imagination do we think that Congress said that no one was to consider cost. Uncle Sam's pockets are deep, but they are not bottomless. We have to have a few corporate taxpayers left to pay for our public interest programs.

These conclusions, we think, are buttressed by the reasoning of Calvert Cliffs' Coordinating Committee v. United States (1971), 146 U.S.App.D.C. 33, 449 F.2d 1109.[3] A few random quotations from the case demonstrate its philosophy.

" 'Environmental amenities' will often be in conflict with 'economic and technical considerations.' To 'consider' the former 'along with' the latter must involve a balancing process."

. . . . . .

"In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not. But NEPA mandates a rather finely tuned and 'systematic' balancing analysis in each instance."

. . . . . .

"We conclude, then, that Section 102 of NEPA mandates a particular sort of careful and informed decision-making process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse."

. . . . . .

[Defendants here insist that they cannot and will not consider other environmental factors.]

. . . . . .

"The sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action."

. . . . . .

---

3. Although speaking only for himself rather than for the court, The Chief Justice reached much the same conclusion in

Aberdeen R. Co. v. SCRAP (1972) 409 U.S. 1207, 93 S.Ct. 1, 34 L.Ed.2d 21.

"NEPA mandates a case-by-case balancing judgment on the part of federal agencies. In each individual case, the particular economic and technical benefits of planned action must be assessed and then weighed against the environmental costs; alternatives must be considered which would affect the balance of values . . . . The point of the individualized balancing analysis is to ensure that, with possible alterations, the optimally beneficial action is finally taken."

We think that the reasoning of *Calvert-Cliffs'* is fully applicable, and we adopt it, just as did the Tenth Circuit Court of Appeals in Davis v. Morton, *infra*.

Moreover, the statute itself and the regulations issued under it contain provisions which we think upset defendants' arguments here. See, Sec. 110(a)(2)(A)(i) of the Clean Air Act; 40 C.F.R. Sec. 51.2(b) and 40 C.F.R. Sec. 51.10. We just cannot accept defendants' position that they can consider nothing other than cleanliness of the air.

We must remember that national ambient air standards for sulphur oxides have been established. They are:

"40 C.F.R. § 50.4. National Primary Ambient Air Quality Standards for sulfur oxides (sulfur dioxide.)

"The national primary ambient air quality standards for sulfur oxides, measured as sulfur dioxide . . . are:

"(a) 80 micrograms per cubic meter (0.03 p. p. m.)—annual arithmetic mean.

"(b) 365 micrograms per cubic meter (0.14 p. p. m.)—Maximum 24-hour concentration not to be exceeded more than once per year."

"40 C.F.R. § 50.5. National Secondary Ambient Air Quality Standards for sulfur oxides (sulfur dioxide.)

"The national secondary ambient air quality standards for sulfur oxides, measured as sulfur dioxide . . . are:

"(a) 60 micrograms per cubic meter (0.02 p. p. m.)—annual arithmetic mean.

"(b) 260 micrograms per cubic meter (0.1 p. p. m.)—maximum 24-hour concentration not to be exceeded more than once per year, as a guide to be used in assessing implementation plans to achieve the annual standard.

"(c) 1,300 micrograms per cubic meter (0.5 p. p. m.)—maximum 3-hour concentration not to be exceeded more than once per year."

We are here concerned only with the primary ambient air standards for sulfur oxides, but it is worthy of note that although defendants now have available testing devices, they are using them in testing for the secondary ambient air standards, and they have not used their calibrated instruments to recheck the primary ambient air readings which they now pretty much admit were erroneous. There was no explanation for their haste to use the instruments on secondary ambient air readings without any effort to check the earlier erroneous readings made as a part of their first ambient air investigation, and we are at a loss to understand their reluctance to recheck their readings. If those readings were correct, defendants' position would be improved. If they were incorrect, defendants should not be unwilling to face up to that fact. Additionally, of course, the erroneous primary ambient air test was for a single 24-hour period, yet the standard itself permits that it be exceeded once a year. Defendants say that a second test is not required because their unproven model demonstrates that the standard would be exceeded more than once. If the model is all that accurate, no actual tests were necessary, but Anaconda's model does not support defendants' conclusions, and, surely, its results are entitled to some consideration, because there is every indication that it is at least as accurate as the government's model.

Nothing said herein is intended as a criticism of nor as an expression of

an opinion as to the wisdom or lack of wisdom exercised in the adoption of the federal ambient air standards for sulfur oxides. It is not the Court's function to fashion those standards, and, in fact, Anaconda doesn't object to them. Nor does the Court intend to substitute itself for the responsible agency in implementing compliance with the standards. We only say that the implementation plan should be adopted to afford compliance with the federal standards, and that the requirements of law should be followed in formulating the implementation plan. Anaconda says that it can and that it will meet the federal primary ambient air standard for sulfur oxides. It is in the process of spending many millions of dollars to meet the requirements of 40 C.F.R. § 50.4. If it fails in its efforts, those millions of dollars will have been wasted, but we cannot accept the argument that Anaconda is not entitled to spend its own money in support of its belief that it will meet the national standard. Anaconda says that the proposed rule will require it to go far beyond the federal primary ambient air standard. We think that the hearing officers are required to permit Anaconda to develop by cross-examination its contentions. We are unable to understand why the hearing panel does not want all of the facts presented to it, and, we repeat that we cannot accept defendants' adamant claim that they can and will consider no alternatives and will consider nothing other than cleanliness of the air.

We have heretofore touched on the jurisdictional question raised by defendants. They say that Sec. 307 of the Clean Air Act [42 U.S.C. § 1857h–5] precludes consideration of the case by this Court. The section on which they rely provides in material part:

"A petition for review of the action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard under section 112, any standard of performance under section 111, any standard under section 202 . . . any determination under section 202(b)(5), any control or prohibition under section 211, or any standard under section 231 may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 or section 111(d) may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation or approval, or after such date if such petition is based solely on grounds arising after such 30th day."

Subsection (c) of Sec. 307 makes provision for taking additional evidence before the Court of Appeals, and this is the route defendants say plaintiff must follow. Defendants choose to disregard the provisions of Sec. 304 of the Act which gives district courts jurisdiction over suits asserting a failure on the part of the Administrator to perform an act or duty under the Act, and which specifically permits district court actions "against any person (including (i) the United States and (ii) any other governmental instrumentality or agency . . . .)" Defendants pay no attention to the fact that no present review is available to plaintiff under Section 307 of the Act because there has been no promulgation of an implementation plan pursuant to 42 U.S.C. § 1857c–5. Certainly, our view is supported by Sierra Club v. Ruckelshaus (1972) D.C.D.C., 344 F.Supp. 253. There the Sierra Club asked to enjoin the Administrator from approving portions of a state air pollution control plan claimed to implement the national ambient air standards. There, as here, the Administrator challenged the court's jurisdiction saying that the Court of Appeals had exclusive original jurisdiction under 42 U.S.C. § 1857h–5 [Sec. 307 of the Clean Air Act.] The Court disagreed, and said:

"The Administrator challenges the jurisdiction of this Court to hear this

case on the theory that the plaintiff should wait until the Administrator approves the plans and then appeal the approval under 42 U.S.C. § 1857h–5. We disagree. It is our judgment that plaintiffs have a right to bring the action in this Court at this juncture under 42 U.S.C. § 1857h–2(a) which provides in pertinent part that

[The opinion then quotes from that which we have denominated as Sec. 304 of the Act, supra.]

". . . Plaintiffs' claim that the Administrator's interpretation of the extent of his authority is clearly erroneous and that his declination to assert his authority . . . amounts to a failure to perform a nondiscretionary act or duty.

"It would appear that such an allegation is precisely the type of claim which Congress . . . intended interested citizens to raise in the district courts. In view of this clear jurisdictional grant, the Administrator's assertion that plaintiffs should await his approval of the state plans (formulated, in part, pursuant to his allegedly illegal regulation) and then proceed to appeal his approval under 42 U.S.C. § 1857h–5 is, in our opinion, untenable."

The reasoning of Sierra Club v. Ruckelshaus is applicable here, as is Judge Doyle's analysis of the jurisdictional problems raised in National Helium Corporation v. Morton (1971) 10 Cir., 455 F.2d 650, where district court jurisdiction was upheld as against an attack which admittedly differs from the one here made. However, it is to be remembered that Anaconda here says that adverse environmental results will ensue and that a NEPA statement is required. That being so, Judge Doyle's comment in *National Helium* is apposite:

"It would be repetitious to discuss at length the further argument of the Secretary that the plaintiffs lack standing. We are unable to say that the companies are motivated solely by protection of their own pecuniary interest and that the public interest aspect is so infinitesimal that it ought to be disregarded altogether. It is not our function to weigh or proportion these conflicting interests. Nor are we called upon to determine whether persons seeking to advance the public interest are indeed conscientious and sincere in their efforts. True, the plaintiffs are not primarily devoted to ecological improvement, but they are not on this account disqualified from seeking to advance such an interest."

Plaintiff claims that a NEPA statement is required [a contention to be discussed more fully in a moment] and we surely have jurisdiction to pass on this question. National Helium Corporation v. Morton (1971) 10 Cir., 455 F.2d 650; Upper Pecos Association v. Stans (1971) 10 Cir., 452 F.2d 1233, [the Supreme Court's action in this case this term in no way questions the trial court's jurisdiction] and Davis v. Morton (1972) 10 Cir., 469 F.2d 593, all recognize a district court's jurisdiction of cases brought to require the filing of a NEPA statement, and that demand is here made.

Relying on these decisions, we find that we have jurisdiction, and we find that we have jurisdiction on the somewhat discretionary grounds enunciated in McKart v. United States (1969) 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194; Abbott Laboratories v. Gardner (1967) 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681; Toilet Goods Association, Inc. v. Gardner (1967) 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697, and Gardner v. Toilet Goods Association (1967) 387 U. S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704.

Under the tests of Oil Shale Corp. v. Udall (1964) D.C.Colo., 235 F.Supp. 606, we think that jurisdiction should be exercised, and we cannot refrain from commenting that we think that economy of judicial time will result from having a full evidentiary hearing before a district judge as compared with an eviden-

tiary hearing before an overloaded Court of Appeals which is the type of trial sought by defendants.

Our finding that we have jurisdiction on this second ground is made with a full awareness of the decision in Pax Company of Utah v. United States (1972) 10 Cir., 454 F.2d 93, an opinion by Judge Doyle who is also the author of Oil Shale Corp. v. Udall, *supra*. We think that we here have the exceptional situation found not to exist in *Pax Company* and found to exist in *Oil Shale Corporation*. We agree "that courts ought not ordinarily to interfere with the administrative process in the absence of the most compelling reasons," but those reasons are here present. Anaconda has spent some $16-million of a budgeted $31-million on its air pollution control procedures. If it is to meet the law's deadlines, it must proceed post haste. Yet, if defendants go forward with their announced plans, Anaconda's money will have been poured down the drain. As the Supreme Court said in Columbia Broadcasting System v. United States (1942) 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563:

> "The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control."

That's this case in a nutshell, and we find that we have jurisdiction on this additional ground, because the irreparable injury missing in *Pax Company* is abundantly present here. Neither Anaconda's interests nor the public's interests permit the foot dragging approach advocated by defendants. With the vast panoply of interests here involved, it is essential that a court intervene at this point, and that jurisdiction be asserted in the exercise of an informed discretion. See, United States v. Abilene and Southern Railway Company (1924) 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016.

On the aspects of the case thus far discussed, we hold, (1) we have jurisdiction; (2) plaintiff is entitled to an adjudicatory hearing before the appropriate EPA officers in their consideration of the "rule" aimed at copper smelters in Deer Lodge County, Montana, emitting 7,040 pounds of sulfur oxide per hour; (3) plaintiff is entitled to attempt to demonstrate at that hearing that its plans will comply with the federal primary ambient air standards for sulfur dioxides [40 C.F.R. 50.4]; (4) plaintiff is entitled to attempt to prove at that hearing that the proposed "rule" for copper smelters in Deer Lodge County, Montana, will require more of plaintiff than is permitted under applicable federal laws and regulations; (5) plaintiff is entitled to at least minimal due process of law at that hearing, including the rights of subpoena, cross-examination and a fair and impartial hearing, which presents for consideration all of the relevant and material facts. With such a hearing, a rule can be promulgated founded on a record which will permit an adequate Sec. 307 review by the Ninth Circuit. We fail to understand defendants' determination to promulgate a rule based on less than a full and fair record. We hereinafter order no ultimate result—we order only due process of law in the administrative hearing in the hope that a rule will be promulgated which will be fair and which will withstand later attack. We order that defendants refrain from plunging ahead on a course which will cause irreparable harm to plaintiff and which may be held to be needless wheel spinning in a later Sec. 307 review.

In support of these conclusions we rely in substantial part on Londoner v. Denver (1907) 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103; BiMetallic Investment Company v. State Board of Equalization (1915) 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372; Goldberg v. Kelly (1969) 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287; Morrissey v. Brewer (1972) 408

U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484; Greene v. McElroy (1958) 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377; W.B.E. N. v. United States (1968) 2 Cir., 396 F. 2d 601, and on American Airlines v. C.A.B. (1966) 123 U.S.App.D.C. 310, 359 F.2d 624. The case last cited holds that an adjudicatory hearing was not required on the facts there present, but we think that it clearly holds that an adjudicatory hearing would be required on our facts. Moreover, if, as was held just this year in Morrissey v. Brewer, supra, a convicted felon is entitled to what amounts to an adjudicatory hearing on parole revocation, we think that an unconvicted corporation is entitled to at least an equivalent amount of due process before it is put out of business. This rationale is fortified by the Supreme Court's decision this year in Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424, where it was held under the civil rights statutes that there is no distinction to be drawn between personal and property rights.

 This brings us to Anaconda's claim that defendants must file a NEPA statement. It would be totally inconsistent for defendants to admit that they are required to file [or are in fact permitted to file] any such statement. This is so because of defendants' thinking that they can consider nothing other than air purity and because of their claim that no other effects—environmental, social or economic—may be taken into account by them, and because of defendants' contention that they cannot even peek at alternatives.

Our disagreement with this concept has already been discussed, but it is starkly clear that when an environmental agency says that its duty is to protect one part of the environment even though that protection causes great harm to another part of the environment, Congress was possessed of great wisdom when it said that *all* governmental agencies must file NEPA statements where there is major federal action. We thought that environmental agencies would be the ones which would be the most concerned with the broad picture of environmental impact and harm, but our naivete is demonstrated by the record in this case.

In support of their contention that no NEPA statements are required of the Environmental Protection Agency, defendants rely heavily on Getty Oil v. Ruckelshaus (1972) 3 Cir., 467 F.2d 349. Dicta in that case may support their position. The sentence from the case on which defendants rely is "Even if we were to agree with Getty's premise that EPA is subject to the NEPA requirement, such an issue is properly raised in a section 307 proceeding." [Getty Oil was ready for Sec. 307 review.] We do not construe this sentence as a direct holding by the Third Circuit, and we do not think that the Third Circuit was looking at a record which could support an administrative finding that the proposed rule would do great harm to other aspects of the environment, the economy and the public welfare and which might result in a "taking" compensable under the Fifth Amendment.

Rather, we rely on Overton Park v. Volpe (1971) 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136;[4] Green County Planning Board v. F.P.C. (1972) 2 Cir., 455 F.2d 412;[5] National Resources Defense Council v. Morton (1972) D.C.Cir., 458 F.2d 827;[6] and Kalur v. Resor (1971)

4. Where the sufficiency rather than the lack of a NEPA statement was under attack, and where the Court said, "Congress clearly did not intend that cost and disruption of the community were to be ignored."

5. Which says that NEPA statements must be filed by all agencies and requires the consideration of the total impact and of alternatives.

6. "Congress contemplated that the Impact Statement would constitute the environmental source material for the information of Congress as well as the Executive, in the making of relevant decisions, and would be available to enhance enlighten-

D.C.D.C., 335 F.Supp. 1. In *Kalur* the identical argument made here was made on the theory that the Army Corps of Engineers is an agency dedicated to guarding the environment and that, therefore, no NEPA statement was required. Headnote 19 of the case accurately summarizes the Court's rejection of this argument. It reads:

"Provisions of the National Environmental Policy Act are applicable to the Army Corps of Engineers even if the Corps is an agency dedicated to guarding the environment."

The court itself said:

"The regulations before the Court today clearly fly in the face of NEPA's mandate that *all* agencies of the Federal Government shall make such reports and include detailed statements as described. There is no exception, as defendants have argued, carved out for those agencies that may be viewed as environment improvement agencies." [7]

Were there no authority from the Tenth Circuit, we would follow these decisions from other courts, but there is authority from the Tenth Circuit, and we are bound by it. [8] Upper Pecos Association v. Stans (1971) 10 Cir., 452 F.2d 1233, clearly recognizes that such statements are required from all agencies. [9] National Helium Corporation v. Morton (1971) 10 Cir., 455 F.2d 650, holds:

"The statement thus prescribed is to be made available to the President, the Council on Environmental Quality,

and the public. This statute does not limit the authority of any governmental agency in any permanent or conclusive manner. It does, however, contain a mandate that action can be taken only following complete awareness on the part of the actor of the environmental consequences of his action and following his having taken the steps required by the Act.

. . . . . .

"The mandatory nature of the NEPA is emphasized in recent decisions. See, for example, Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, [146 U. S.App.D.C. 33] 449 F.2d 1109 (D.C. Cir. 1971) . . . . As we view it then the purposes of the NEPA are realized by requiring the agencies to assess environmental consequences in formulating policies, and by insuring that the governmental agencies shall pay heed to environmental considerations by compelling them to follow out NEPA procedures.

"The Secretary in the instant case proposes to take an action which has environmental consequences, namely rapid depletion of the helium resources of the country. Whether the Secretary's proposed action has significant long-range consequences, or whether the environmental effects are insignificant in relationship to the countervailing government interests, are decisions which are left to the Secretary. The important thing is that he must consider the problem.

---

ment of—and by—the public. The impact statement provides a basis for (a) evaluation of the benefits of the proposed project *in light of its environmental risks*, and (b) *comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action.* . . .
"A sound construction of NEPA, which takes into account both the legislative history and contemporaneous executive construction . . . requires a presentation of environmental risks incident to reasonable alternative courses of action. . . . A rule of reason is implicit in

this aspect of the law as it is in the requirement that the agency provide a statement concerning those opposing views that are responsible."

7. This decision is in part the reason for the amendment of the Water Pollution Act which we shall discuss presently.

8. The Supreme Court's action in this case this term does nothing other than to emphasize the strength of the requirement.

9. The Forest Service which was the lead agency in *Upper Pecos* is also a quasi environmental agency.

As was said by the D.C. Circuit in *Calvert Cliffs, supra*:

> " 'The sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action.' "

In the face of *National Helium*, defendants say that they will not and are not permitted to consider "all types of environmental impact" of their proposed action. If defendants' position is correct, *National Helium* doesn't mean what it says.

Less than a month ago, Davis v. Morton, 469 F.2d 593 was decided by the Tenth Circuit. The question involved was whether an impact statement was required before a lease of Indian lands could be entered into. The Pueblo of Tesuque leased the lands to a New Mexico corporation for development purposes. Judge Hill said:

> "Appellees' primary thesis is that although the contractual relationship between Sangre and the Pueblo is a lease, it is not a federal lease and therefore does not constitute major federal action. The United States did not initiate the lease, was not a party, possessed no interest in either the lease or the development, did not participate financially or benefit from the lease in any way. Before federal action will constitute major federal action under the mandates of NEPA, the government must initiate, participate in or benefit from the project.
>
> [The opinion then quotes 42 U.S.C. § 4331(b).]

> "These general mandates reflect Congress' attitude toward preserving our environment. To ensure the implementation of these substantive requirements, Congress established procedural guidelines. One in particular applies to the instant case, 42 U.S.C. § 4332(2)(C). This section directs *all* agencies to present a detailed statement on the environmental impact of the proposed action. This impact statement will aid the agency in determining what proper course of action should be taken in each situation as it arises.

> "It is clear Congress passed this legislation out of concern for our natural environment. *NEPA requires all federal agencies to consider values of environmental preservation in their spheres of activity.*

> [The opinion quotes from Calvert Cliffs, and the quote includes this language: " 'It is not only permitted but compelled to take environmental values into account. Perhaps the greatest importance of NEPA is to require the Atomic Energy Commission and other agencies to *consider* environmental issues just as they consider other matters within their mandates.' "]

> "Senator Jackson, NEPA's principal sponsor, said on the floor just before final Senate approval that the Act 'directs *all* agencies to assure consideration of the environmental impact of their actions *in decision-making*. 115 Cong.Rec. (Part 30) 40416 (1969). Reading the Act and its legislative history together, there is little doubt that Congress intended *all* agencies under their authority *to follow the substantive and procedural* mandates of NEPA. . . .

> "We conclude approving leases on federal lands constitutes major federal action and thus must be approved according to NEPA mandates. *As our court had occasion to consider once before, this Act was intended to include all federal agencies, including the Bureau of Indian Affairs.* See, National Helium Corporation v. Morton, 455 F.2d 650 (10th Cir. 1971)."

Davis v. Morton is but another way of saying what 42 U.S.C. § 4332(2)(C) says:

> "The Congress authorizes and directs that, to the fullest extent possible: . . . (2) *all agencies of the Federal Government shall—*. . . (C) include in every recommendation or report on proposals for legislation and other major Federal actions signifi-

cantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented . . . ."

Presently, the latest case applying this principle is Environmental Defense Fund v. United States Army Corps of Engineers, decided November 28, 1972, 8 Cir., 470 F.2d 289.

Thus Congress and the Tenth Circuit, and other circuits, have said that NEPA statements are required of *all* federal agencies, and this reduces the problem to a pure syllogism:

Major premise: All federal agencies must file a NEPA statement.
Minor premise: EPA is a federal agency.
Conclusion: EPA must file a NEPA statement.

█ Defendants attempt to extricate themselves from this inevitable conclusion by arguing that a 1972 amendment to the Federal Water Pollution Control Act covers the Clean Air Act. The Water Pollution Act was amended in 1972 to say, "no action of the administrator taken pursuant to *this* Act shall be deemed major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969." [10] Defendants quote from the legislative history to argue that the amendment was intended to apply to the Clean Air Act. Plaintiffs quote from the legislative history to show that it was not. But, there is no reason to refer to legislative history. One does that

only when statutes are ambiguous. The National Environmental Policy Act isn't. It applies to *all* federal agencies, and the Environmental Protection Agency is by its very title an agency of the United States Government. It is covered and it is expressly covered by 42 U.S.C. § 4332(2)(C), and the 1972 amendments to the 1972 Water Pollution Act create no exception under the Clean Air Act. In a masterful non sequitur, defendants say in their brief, "However, since several courts had interpreted NEPA as applying to the EPA, Congress was required to correct the judicial misunderstanding by stating explicitly in Section 511(c) [of the amendments to the Water Pollution Act, 86 Stat. 816] that NEPA is inapplicable to the EPA," and defendants reason that although Congress amended only the Water Pollution Act, they really intended to amend the Clean Air Act too. This jibes with defendants' construction of the business judgment of Congress which we have earlier discussed, but it doesn't jibe with our belief that if Congress had wanted to exempt EPA from the requirements of 42 U.S.C. § 4332(2)(C) in all instances it would have said so. Realizing that EPA will promptly and disgustedly charge more "judicial misunderstanding," we attribute to Congress more clarity of expression than does EPA in its ipse dixit on Congressional intent. If Congress wants to exempt EPA from the requirement for impact statements in Clean Air Act cases, it can and it will amend the statute. However, we doubt that the record in this case is one on which defendants will want to rely in seeking such an exemption. If ever there were a case to prove that EPA too should consider all environmental and other relevant factors, this is that case. If Congress wants to risk issuing a blank check to EPA to pay possible future just compensation claims, that is a decision for Congress to make, but as we read the statutes, that isn't what Congress has said in the Clean Air Act, and

---

10. This amendment may well have resulted from the decision in Kalur v. Resor, *supra*.

until Congress speaks, EPA must file impact statements, because it is an agency of the United States Government, and the law applies to *all* agencies.

In conclusion, what we have held today can be summarized with the comment that no matter how righteous they may believe their cause to be, zealots must remember that constitutional and statutory requirements must be met. The words of Mr. Justice Holmes in Pennsylvania Coal Co. v. Mahon (1922) 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322, bear repetition:

> "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

We think that when Congress passed the Clean Air Act, it intended that the Act be implemented with a view of the broad picture, rather than by the use of tunnel vision, and we do not think that Congress thought that those charged with enforcement of the Act would do so without regard for the constitutional and statutory rights of the industries whose taxes provide much of the wherewithall to run our government, and without regard for the correlative rights of the public. We are directing the EPA *festina lente.*

We think that plaintiffs have shown their entitlement to a preliminary injunction under the principles of Atomic Oil Company of Oklahoma v. Bardahl Oil Company (1969), 10 Cir., 419 F.2d 1097; Continental Oil Company v. Frontier Refining Company (1969) 10 Cir., 338 F. 2d 780; United States v. Brown (1969) 10 Cir., 331 F.2d 362; Crowther v. Seaborg (1969) 10 Cir., 415 F.2d 437; Automated Marketing Systems, Inc. v. Martin (1972) 10 Cir., 467 F.2d 1181; and Colorado Labor Council v. American Federation of Labor—CIO (1972) D.C. Colo., 349 F.Supp. 37. Therefore,

It is ordered that:

Defendants and each of them be, and they hereby are enjoined from promulgating a rule and from conducting any hearing intended to lead to the promulgation of a rule or regulation specifically directed at control or limitation of sulfur dioxide emissions from plaintiff's smelter in Deer Lodge County, Montana, unless the promulgation of such rule shall follow and shall be based upon an adjudicatory hearing with provision being made therein to afford plaintiff due process of law, including the right of plaintiff to subpoena witnesses and to cross-examine witnesses testifying against its interests.

[The type and full extent of due process which will be required is not spelled out in this order because of the language in Morrissey v. Brewer (1972) 408 U.S. 471, [92 S.Ct. 2593, 33 L.Ed.2d 484] and the language of the cases there relied upon. As is said in *Morrissey,* "Due process is flexible and calls for such procedural protections as the particular situation demands." Jurisdiction is retained to determine the type of due process required should future disputes arise between the parties.]

It is further ordered that:

No rule specifically directed at control or limitation of sulfur dioxide emissions from plaintiff's smelter in Deer Lodge County, Montana, shall be promulgated by defendants and no hearing intended to lead to the promulgation of such a rule shall be held until an environmental impact statement is prepared pursuant to the provisions of Sec. 102(2)(C) of the National Environmental Policy Act [42 U.S.C. § 4332(2)(C)].

In accordance with the provisions of Rule 65(c) F.R.Civ.P. and in accordance with the mandate of Atomic Oil Company of Oklahoma v. Bardahl Oil Company, *supra,* the effectiveness of this preliminary injunctive order is conditioned upon the filing of a bond by plaintiff in the amount of $30,000.00, which bond shall be conditioned to comply with the provisions of Rule 65(c) F.R.C.P., "for the payment of such costs and damages as may be incurred or suffered by any

party who is found to have been wrongfully enjoined or restrained."

Should I determine on final hearing, or should an appellate court determine that this injunction has been wrongfully issued, defendants will be entitled to recover "such costs and damages as may be incurred or suffered by any party" who was wrongfully enjoined. It would seem that such costs and damages would be the additional expense incurred in holding the adjudicatory hearing and in filing the NEPA statement. Those expenses could hardly exceed $25,000.00, but to allow for a margin of safety, the amount of the bond is fixed at $30,000.00, with the direction that should recovery be sought on the bond at some future date, defendants will be held to strict proof to establish their costs and damages incurred or suffered by them as a result of a wrongful injunction.