WILLIAM TEXTER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, RESPONDENT AND CROSS-APPELLANT, v. DEPARTMENT OF HUMAN SERVICES, ANN KLEIN, COMMISSIONER; DIVISION OF PUBLIC WELFARE, G. THOMAS RITI, DIRECTOR, APPELLANTS AND CROSS-RESPONDENTS.

BERTHA & WILLIAM McNINNEY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, RESPONDENTS AND CROSS-APPELLANTS, v. DEPARTMENT OF HUMAN SERVICES, ANN KLEIN, COMMISSIONER; DIVISION OF PUBLIC WELFARE, G. THOMAS RITI, DIRECTOR, APPELLANTS AND CROSS-RESPONDENTS.

MARY BOYD, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, RESPONDENT AND CROSS-APPELLANT, v. DEPARTMENT OF HUMAN SERVICES, ANN KLEIN, COMMISSIONER; DIVISION OF PUBLIC WELFARE, G. THOMAS RITI, DIRECTOR, APPELLANTS AND CROSS-RESPONDENTS.

LENA CICCONE, RESPONDENT AND CROSS-APPELLANT, v. DEPARTMENT OF HUMAN SERVICES, ANN KLEIN, COMMISSIONER; DIVISION OF PUBLIC WELFARE, G. THOMAS RITI, DIRECTOR, APPELLANTS AND CROSS-RESPONDENTS.

LAURA MATTHEWS, RESPONDENT AND CROSS-APPELLANT, v. DEPARTMENT OF HUMAN SERVICES, ANN KLEIN, COMMISSIONER; DIVISION OF PUBLIC WELFARE, G. THOMAS RITI, DIRECTOR, APPELLANTS AND CROSS-RESPONDENTS.

FRANK COPPOLA, RESPONDENT AND CROSS-APPELLANT, v. DEPARTMENT OF HUMAN SERVICES, ANN KLEIN, COMMISSIONER; DIVISION OF PUBLIC WELFARE, G. THOMAS RITI, DIRECTOR, APPELLANTS AND CROSS-RESPONDENTS.

Argued October 6, 1981—Decided March 18, 1982.

*Barbara A. Harned,* Deputy Attorney General, argued the cause for appellants and cross-respondents (*James R. Zazzali,*

Attorney General of New Jersey, attorney; *Erminie L. Conley,* Assistant Attorney General, of counsel).

*James G. Gavin* argued the cause for respondents and cross-appellants (*Stephen M. Latimer,* Acting Director, Camden Regional Legal Services, Inc. and *Richard S. Semel,* Project Administrator, Bergen County Legal Services, attorneys; *James G. Gavin* and *Michaelene Loughlin,* on the briefs).

The opinion of the Court was delivered by

POLLOCK, J.

The issue in this case is whether administrative regulations, valid when promulgated, have been rendered invalid by changing conditions. More specifically, the question concerns the effect of eighteen years of inflation on regulations of the Department of Human Services that determine income eligibility requirements for receipt of Medical Assistance for the Aged. We remand to the Commissioner to consider the matter as a petition to amend the regulation setting the income eligibility requirements.

I

Plaintiffs are six individuals who have been receiving home health benefits under New Jersey's Medical Assistance for the Aged program. *N.J.S.A.* 44:7–76 to –84 (Supp.1981) (MAA). Before July 1980, each plaintiff was a New Jersey resident, age 65 or over, not eligible for Medicaid and with insufficient income and resources to pay for health services covered by the MAA program. Each, therefore, was eligible to participate in MAA.

Plaintiffs are joined by common bonds of old age, failing health and indigency. For example, plaintiff Frank Coppola is 79 years old and lives with his wife of about the same age. He has cardiac and prostate ailments requiring care 24 hours per

day. His home health care consists of visits of 24 hours per week by a home health aide, and semi-weekly visits by a registered nurse. Plaintiff Laura Matthews lives with her daughter and son-in-law. She is nearly comatose, confined to bed and requires a urinary catheter. She receives visits of 15 hours per week from a home health aide and semi-monthly visits from a registered nurse. Plaintiff Lena Ciccone, age 84, lives with her daughter. She suffers from senility, diabetes and severe arthritis. She receives 12 hours per week of assistance from a home health aide, drug prescriptions and visits by a community nurse. Plaintiff Mary Boyd, age 95, suffers from chronic brain syndrome, osteoarthritis and incontinence. She receives 10 hours per week of assistance from a home health aide and semi-monthly visits from a registered nurse. Plaintiffs Bertha and William McNinney both suffer from various ailments, including severe diabetes, hypertension, and arteriosclerotic heart disease. Their benefits consist of 20 hours per week of care by home health aides. Plaintiff William Texter, age 70, suffers from organic brain syndrome. He receives visits of 15 hours per week from home health aides and semi-monthly visits from registered nurses.

On July 1, 1980 each plaintiff received a 14.37% increase in Social Security benefits. This increase caused each plaintiff's monthly income to exceed MAA's income eligibility standard contained in *N.J.A.C.* 10:83–6.5. Although the increase was intended to help beneficiaries to keep pace with inflation, it generated the opposite effect on plaintiffs. By forcing discontinuance of MAA benefits, plaintiffs were made individually responsible for their medical costs. Those costs will consume most of the income of some plaintiffs; for others, the costs will exceed their income.[1]

---

[1] The following chart demonstrates the relationship of each plaintiff's income to cost of MAA services.

The Department became aware of the increase during its regular eligibility reevaluations, which revealed that each plaintiff's income now exceeded eligibility standards. *N.J.A.C.* 10:83–9.1, –9.2. Accordingly, the Department notified each plaintiff that MAA benefits would terminate.

Plaintiffs exercised their right to a hearing, at which the only issue was whether their increased income made them ineligible for MAA. At the hearing, plaintiffs challenged the validity of the income eligibility standard in *N.J.A.C.* 10:83–6.5. They alleged that, since 1963 when the regulation was promulgated, the effect of inflation was to render the income limit so low as to be arbitrary and capricious. In effect, plaintiffs sought to raise the income standard to reflect financial need under current economic conditions.

In upholding the termination of each plaintiff's MAA benefits, the Administrative Law Judge (ALJ) did not discuss the effect of inflation on the income eligibility standard. Noting that the standards were determined at the discretion of the Commissioner, the ALJ suggested that any complaints concerning income requirements should be directed to the Commissioner. The Department adopted the ALJ's decisions as its final rulings.

Plaintiffs appealed to the Appellate Division, which reversed and remanded the matters to the ALJ to consider the merits of plaintiffs' challenge to the continuing validity of the standard. That court stated "slavish adherence" to a 17-year-old income eligibility standard "may not be in overall furtherance of [legislative] policy." 178 *N.J.Super.* 104, 108 (1981).

| Plaintiff | Income | Cost of MAA Services |
|-----------|--------|----------------------|
| Texter | $673.40 | $592.58 |
| McNinney, B. & W. | 663.60 | 718.10 |
| Boyd | 648.70 | 413.05 |
| Ciccone | 511.50 | 419.00 |
| Matthews | 702.00 | 592.58 |
| Coppola | 609.00 | 915.72. |

We agree with the Appellate Division that the merits of the plaintiffs' claims should be considered in an administrative proceeding. Rather than remanding the individual cases to an ALJ for adjudication, however, we believe the matter should be remanded to the Commissioner to consider amending the regulation setting the income eligibility requirements.

## II

The second half of this century has witnessed increasing attention to health care for the needy, particularly the aged. The problem is complex and has produced overlapping and sometimes conflicting solutions from state and federal officials.

Before enacting Medicare and Medicaid, the federal government partially funded medical care to the needy aged under the Kerr-Mills program. 42 *U.S.C.A.* § 301 *et seq.* (repealed 1974). To participate in the Kerr-Mills program, New Jersey established MAA in 1962. *L.* 1962, *c.* 222. The original Act provided financial assistance to any New Jersey resident over age 65 who was not a recipient of old age assistance and whose income and resources were insufficient to meet the costs of health services. *Id.* at § 1. The Commissioner was given the authority to issue regulations implementing the Act, including authority to determine the need for medical assistance based on the "income and resources of the aged individual making due allowance for a minimum standard of living compatible with decency and health." *Id.* at § 6(c). In 1963, the Commissioner exercised that authority and issued the income eligibility standard contained in *N.J.A.C.* 10:83–6.5.

In 1965, Congress replaced this part of the Kerr-Mills program with Medicare, 42 *U.S.C.A.* § 1395 *et seq.* (1974 & Supp.1981), and Medicaid, 42 *U.S.C.A.* § 1396 *et seq.* (1974 & Supp.1981). To qualify for matching federal Medicaid funds, states were required to provide medical assistance for the categorically needy: those receiving old age assistance, the blind, families with dependent children and the permanently and totally dis-

abled who receive supplemental social security payments. 42 *U.S.C.A.* § 1396a(a)(10)(A). States were free to assist other medically needy individuals, 42 *U.S.C.A.* § 1396a(a)(10)(C)(i), if they assisted equally all the needy. *Id.* at (C)(ii).

Because extension of Medicaid to all medically needy persons was considered too costly, the Legislature chose not to include all MAA beneficiaries in its Medicaid plan. *See* Assembly Committee on Institutions and Welfare, *Medical Care for Low Income Persons in New Jersey* 15 (Sept. 10, 1968). Instead, it chose to transfer as many MAA recipients as possible to the Medicaid program. Although not obliged to provide additional funds, the Legislature continued the MAA program for those elderly needy whose income disqualified them from the Medicaid program. *See id.* at 16. In 1969, therefore, the Legislature amended MAA to apply to people age 65 or over who cannot pay for medical services, but who are ineligible for Medicaid. *L.* 1969, *c.* 227, § 1, *N.J.S.A.* 44:7–76 (Supp.1981). Nonetheless, the Commissioner retained the 1963 MAA income eligibility standard, which has remained unchanged. Consequently, the maximum monthly income allowed a non-institutionalized participant is higher under MAA than under Medicaid: $500 per month under MAA, but only $261 per month under Medicaid. *Compare N.J.A.C.* 10:83–6.5 *with N.J.A.C.* 10:94–4.3.[2]

### III

Judicial review of administrative action is a limited inquiry into whether the action is arbitrary, capricious and unreasonable or unsupported by substantial credible evidence. *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–580 (1980). This limited review prevents the courts from usurping policy decisions from other branches of government. *See Newark v.*

---

[2]Under Medicaid the income eligibility standard for a particular applicant depends upon the participant's living arrangements. *See N.J.A.C.* 10:94–4.33, Table A. Under MAA the standard depends upon the participant's marital status. *See N.J.A.C.* 10:83–6.5.

*Natural Resource Counc. Dept. of Environmental Protection,* 82 *N.J.* 530, 542 (1980). Courts, however, have discretion to remand administrative action for further agency proceedings in the interest of justice. *Wilson v. Mountainside,* 42 *N.J.* 426, 442 (1964). Several factors move us to remand these matters to the Commissioner to consider amending the income eligibility standard.

█ The income eligibility standards are set forth in administrative regulations; in effect, plaintiffs seek to amend the regulations by increasing the income eligibility standard. They present statistics showing that prices have more than doubled since 1963, substantially eroding plaintiffs' ability to pay for urgently needed services.[3] That erosion raises a question whether the MAA income eligibility standard now deviates from the policies of the MAA program as conceived by the Legislature. *See Abelson's, Inc. v. N. J. State Bd. of Optometrists,* 5 *N.J.* 412, 424 (1950). Because of economic turmoil, this regulation may have become outdated by remaining unchanged. One does not need to be an expert in economics to realize that the past 18 years have been difficult for people living on fixed incomes, particularly the indigent elderly.

At the time plaintiffs challenged the income eligibility requirement, the only available procedure was an adjudicatory proceeding. Recent amendments to the Administrative Procedure Act (APA), however, permit plaintiffs to petition to amend the rule setting the income eligibility standard. *L.* 1981, *c.* 27, § 11(f) (amending *N.J.S.A.* 52:14B-4).

Administrative agencies have wide discretion in selecting the means to fulfill the duties that the Legislature delegated to them. Agencies may act informally, Shapiro, "The Choice of

___

[3]Plaintiffs used the Consumer Price Index (CPI) to show the effects of inflation. The CPI uses 1967 as its base year, valuing that year's prices at 100. According to CPI, prices in 1963 equalled 91.9; in July 1980 they equalled 247.8.

Rulemaking or Adjudication in the Development of Administrative Policy," 78 *Harv.L.Rev.* 921, 923 (1965) ("Rulemaking or Adjudication"), or formally through rulemaking or adjudication in administrative hearings. *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n.,* 85 *N.J.* 325, 338 (1981) (Handler, J., concurring); *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138, 154 (1962).

Classification of agency action, though easy in theory, is often difficult to apply in specific cases. *See Cunningham v. Department of Civil Service,* 69 *N.J.* 13, 20 (1975); *Boller Beverages, Inc., supra,* 38 *N.J.* at 154; Shapiro, "Rulemaking or Adjudication," 78 *Harv.L.Rev.* at 924. *Compare Anaconda Co. v. Ruckelshaus,* 352 *F.Supp.* 697, 702 (D.Colo.1972) (individualized rulemaking requires evidentiary hearing) *with id.,* 482 *F.*2d 1301, 1306–1307 (10 Cir. 1973) (APA notice and comment procedure sufficient for individualized rulemaking). New Jersey's APA, *N.J.S.A.* 52:14B–1 to –15 (1970 & Supp.1981) as amended, *L.* 1981, *c.* 27, separates formal agency action into administrative adjudication and rulemaking.

Adjudicatory proceedings usually determine the legal rights and relations of specific individuals, *see Bally Mfg. Corp., supra,* 85 *N.J.* at 340; Shapiro, "Rulemaking or Adjudication," 78 *Harv.L.Rev.* at 924, 930, or a limited group of individuals. *N.J.A.C.* 1:1–6(a)(iii). These determinations often involve disputed factual issues, *see Bally Mfg. Corp., supra,* 85 *N.J.* at 340; *Cunningham, supra,* 69 *N.J.* at 23; *N.J.A.C.* 1:1–1.5(a)(3), and require evidence and cross-examination in an adversary proceeding for proper resolution. *N.J.S.A.* 52:14B–9(c), –10(a) (1970 & Supp.1981).

Typically, adjudicatory hearings are what the APA calls "contested cases". *N.J.S.A.* 52:14B–2(b). But the terms are not coextensive. Contested cases are those in which the Constitution or a statute requires an adjudicatory hearing. *Id.* Adjudicatory hearings may be granted at the discretion of the agency in other circumstances. *See In re Orange Savings Bank,* 172

*N.J.Super.* 275, 283 (App.Div.), app. dism., 84 *N.J.* 433 (1980) (once Commissioner determines hearing is advisable, agency must conform to APA procedures for contested cases).

Generally, administrative rulemaking proceedings involve broader policy judgments. These proceedings seek to develop facts through investigation so that rules of prospective application may be developed. *See Boller Beverages, Inc., supra,* 38 *N.J.* at 151–152; Shapiro, "Rulemaking or Adjudication," 78 *Harv.L.Rev.* at 935. Although rules generally apply to a large class of individuals, rules that affect specific parties are nonetheless valid if enough other characteristics of rulemaking are present. *See Bally Mfg. Corp., supra,* 85 *N.J.* at 343; *Cunningham, supra,* 69 *N.J.* at 22; Shapiro, "Rulemaking or Adjudication," 78 *Harv.L.Rev.* at 924.

Administrative agencies possess the ability to be flexible and responsive to changing conditions. *See Heir v. Degnan,* 82 *N.J.* 109, 121 (1980). This flexibility includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy. *See N.J.S.A.* 52:14F–7(a) (Supp. 1981). Therefore, agencies sometimes develop hybrid proceedings possessing characteristics of both adjudication and rulemaking. *See Cunningham, supra,* 69 *N.J.* at 21 (public utility ratemaking procedures, although quasi-legislative in origin, are conducted like quasi-judicial proceedings); *N.J.A.C.* 1:1–1.6(a)(3). In fact, courts and commentators have encouraged hybrid agency proceedings as a way of producing more reasoned agency decisions, especially in complex and controversial policy areas. *See, e.g., International Harvester Co. v. Ruckelshaus,* 478 *F.*2d 615, 649 (D.C.Cir.1973); *id.* at 651–652 (Bazelon, C. J., concurring); Bazelon, "Coping with Technology Through the Legal Process", 62 *Cornell L.Rev.* 817, 824–826 (1977); Stewart, "Vermont Yankee and the Evolution of Administrative Procedure," 91 *Harv.L.Rev.* 1805, 1812–1814 (1978).

The choice of proceedings, however, rests within the discretion of the agency. Courts normally defer to that choice so long as

the selection is responsive to the purpose and function of the agency. *Bally Mfg. Corp., supra,* 85 *N.J.* at 339, 341. Here, the Commissioner initially established the income eligibility requirement by regulation. Plaintiffs' challenge is typical of a request for rulemaking in that it involves investigative fact-finding, general background information and evaluation of the impact of the standard for income eligibility. In addition, the APA now requires agencies to assess the socio-economic impact of proposed regulations. *L.* 1981, *c.* 27, § 2 (amending *N.J.S.A.* 52:14B–4). *See* 13 *N.J.R.* 177 (April 9, 1981) (proposed amendment to *N.J.A.C.* 1:39–3.1(b)(3)(iii)) requiring agencies, in rulemaking, to consider the rules' social impact on the public, especially on those individuals proposed to be regulated "and including any ... differential impact on different segments of the public." That language encompasses the assessment of the impact of inflation on the MAA income eligibility standard. Consequently, a rulemaking procedure is more appropriate than case-by-case adjudication of plaintiffs' claims. *See generally,* Shapiro, "Rulemaking or Adjudication," 78 *Harv.L.Rev.* 921 (1965). On remand, the Commissioner should consider plaintiffs to have petitioned for amendment of *N.J.A.C.* 10:81–6.5.

Our dissenting colleague agrees that the responsibility for determining the scope of MAA benefits rests with the Legislature. *Post* at 391. The Legislature has determined that the right to MAA benefits is not absolute, but is "[s]ubject to the provisions of this act". *N.J.S.A.* 44:7–76.[4] In one of those provisions, the Legislature delegated to the Commissioner the authority to determine income eligibility standards "making due allowance for a minimum standard of living compatible with

---

[4]In its entirety, the section reads:

Subject to the provisions of this act, any resident of New Jersey who has attained the age of 65 years, who is not eligible to receive medical assistance pursuant to chapter 413 of the laws of 1968, and whose income and resources are insufficient to meet the costs of health services provided under this act, shall be entitled to receive medical assistance for the aged.

decency and health." *N.J.S.A.* 44:7–81(c). *Cf. N.J.S.A.* 44:7–77 (medical assistance to be paid to eligible individuals "to the extent authorized in regulations"). In 1963, the Commissioner adopted regulations setting income eligibility standards. Although intervening inflation has not erased those regulations, it justifies reconsideration of their continuing validity. In almost twenty years, the Commissioner has not conducted a formal proceeding to review the income eligibility standards. Since the creation of MAA, the Legislature has provided a procedure for reconsidering the continuing validity of administrative regulations such as those setting the MAA income eligibility standard. *L.* 1981, *c.* 27, § 11(f). In effect, petitioners seek to amend the regulations. Under the circumstances, we conclude that the appropriate judicial role is to defer to the legislative determination that the administrative agency should have the opportunity to review its regulations.

## IV

One measure of the validity of an administrative regulation is whether it is consistent with the expressed policy of the enabling statute and related legislation. *See Guttenberg Savings & Loan Ass'n v. Rivera,* 85 *N.J.* 617, 624 (1981); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561–562 (1978). In evaluating plaintiffs' claims, the Commissioner should consider changes in state policy manifesting renewed concern for the elderly. Since 1963, when the Commissioner issued the income eligibility standard, the New Jersey Legislature has manifested increasing interest in the well-being of its elderly residents.

In 1971, the Legislature found that many elderly are isolated, economically deprived and ill-prepared to cope with the change in family relationships. *N.J.S.A.* 40:23–6.38(c) (Supp.1981). Consequently, the Legislature expressed a desire to help the elderly grow old with dignity and independence. *Id.* at (d). To effectuate this policy, the Legislature established a Division on

Aging, *N.J.S.A.* 26:1A–107 (Supp.1981), and authorized the counties to establish an Office on Aging. *N.J.S.A.* 40:23–6.39 (Supp. 1981). Other recent legislative programs show a continuing commitment to the basic needs of the elderly. *See N.J.S.A.* 30:4D–21 (1981) (pharmaceutical assistance to State residents 65 or older whose income is less than $9000, if single, or less than $12,000 if married); *N.J.S.A.* 48:2–29.16 (Supp.1981) (lifeline utility credit for those eligible for pharmaceutical assistance to the aged, those receiving Supplemental Social Security or those aged receiving disability payments). Even more recently, in the 1981 general election, voters approved a constitutional amendment authorizing the use of State revenues derived from casinos to fund "health services or benefits" for eligible senior citizens. *N.J.Const.*, Art. IV, § VII, par. 2 (Cum.Supp. Jan. 1982). *See also N.J.A.C.* 10:81–1.1 (assistance should be "[e]xtended in a manner and environment which increase a person's importance, dignity and self-esteem"). Federal policy also encourages independence and self-care for recipients of Medicaid, 42 *U.S.C.A.* § 1396, and recipients of medical care generally. *See, e.g.,* 42 *U.S.C.A.* § 6010(2) (developmentally disabled have right to treatment in setting least restrictive of personal liberty).

The interaction between the Medicaid and MAA maximum income eligibility standards, however, appears to undermine the federal and state policy of encouraging independence for the elderly. For example, to qualify for the maximum Medicaid allowance, $714, a recipient must enter an "approved facility", *e.g.,* a hospital or nursing home. *N.J.A.C.* 10:94–4.33, Table A. By contrast, the maximum MAA allowance, $500, is provided to recipients who receive their health care at home. *N.J.A.C.* 10:83–6.5. As a result, the interaction of MAA and Medicaid encourages MAA recipients with incomes between $500 and $714, such as plaintiffs, to enter approved facilities where the cost of maintenance is higher than the cost of health care at home. That result fosters the removal of elderly people from their families and their placement, at greater public expense, in institutions. Compassion and economy protest that bitter irony.

Consequently, the Commissioner should evaluate the MAA income eligibility requirements in light of the policy of encouraging the elderly to be self-sufficient, independent and part of their community.

We recognize that the Commissioner is duty bound to consider the availability of funds for any increase in the MAA income eligibility standard. Therefore, the economic costs of the regulation are relevant on remand. In this regard, the Commissioner should explore the number of medically needy elderly who would be added to the MAA program and the estimated increased costs to the State if the income eligibility standard were increased. The Commissioner should also consider, however, the current regulation's economic impact on the recipients. *L.* 1981, *c.* 27, § 2 (amending *N.J.S.A.* 52:14B–4 to require agency statement of socio-economic impact of proposed rules). *See* 13 *N.J.R.* 177, *supra.* *Cf. N.J.S.A.* 52:13F–1 to –5 (Supp.1981) (requiring determination of the long and short term economic effects of proposed legislation on those against whom it is directed). Obviously, the Commissioner should also consider any other factor that he deems appropriate. In remanding, we recognize the difficult decisions confronting the Commissioner and the Legislature in trying, in a time of increasing costs, to continue essential human services with constant, or even reduced funds. The ultimate determination of the income eligibility standard is a legislative and administrative judgment, subject to judicial review. On review, a court is obliged to accord a presumption of validity to an administrative regulation, and the burden is on the challenger to demonstrate that the regulation is arbitrary, capricious and unreasonable. *New Jersey Guild of Hearing Aid Dispensers v. Long, supra,* 75 *N.J.* at 561. In assessing the validity of a regulation, a court is not free to substitute its judgment for the expertise of the agency. *Id.* at 562. Because we are remanding the matter to the Commissioner, we need not determine the validity of the challenged regulations at this time.

We affirm and modify by remanding these matters to the Commissioner for further proceedings consistent with this opin-

ion. We direct further that the termination of benefits be stayed pending the completion of the administrative proceedings.

PASHMAN, J. dissenting.

The issue here is the continued validity of eligibility standards for Medical Assistance for the Aged (MAA) promulgated by the Department of Human Services in 1963 and not adjusted for inflation since then. The majority remands to the Commissioner to consider amending the regulations, directing him to take into account the medical needs of the plaintiffs, the economic costs of the program and "any other factors that he deems appropriate." (at 381) I agree that these regulations need serious re-evaluation. However, contrary to the majority, I would hold the regulations facially invalid. I would remand only for the purpose of drafting new regulations consistent with the statute, *N.J.S.A.* 44:7–76 to –84.

The MAA statute sets forth a clear and unambiguous entitlement to medical assistance. "Subject to the provisions of this act, any resident of New Jersey [over 65 years old and ineligible for Medicaid], whose income and resources are insufficient to meet the costs of health services provided under this act, *shall be entitled* to receive medical assistance for the aged." *N.J.S.A.* 44:7–76 (emphasis added). In implementing this entitlement, the Commissioner is directed

> [t]o provide that, in determining need for medical assistance for the aged and the amount of such assistance to be granted, there shall be taken into consideration all other income and resources of the aged individual, *making due allowance for a minimum standard of living compatible with decency and health.* [*N.J.S.A.* 44:7–81(c) (emphasis added)]

There can be no confusion about the meaning of these provisions. Any eligible person who needs MAA services and cannot reasonably afford them must be provided such services.[1]

---

[1] To justify its position that the Commissioner can set standards which contravene the above-cited portion of *N.J.S.A.* 44:7–81(c), the majority relies

MAA eligibility standards which deny benefits to persons clearly falling within the statutory entitlement must be held invalid. "Administrative regulations, of course, cannot alter the terms of a legislative enactment or frustrate the policy embodied in the statute." *New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Commission*, 82 *N.J.* 57, 82 (1980). *See Common Cause v. New Jersey Election Law Enforcement Commission*, 74 *N.J.* 231, 243 (1977); *Abelson's, Inc. v. New Jersey State Board of Optometrists*, 5 *N.J.* 412, 423–24 (1950). The majority opinion ignores this basic premise. By suggesting that consistency with the underlying statute is merely "[o]ne measure of the validity of an administrative regulation," at 387, the majority implies that these regulations could be upheld despite being inconsistent with the statute.

Expressing concern for the economic difficulties faced by the State, the majority suggests that "the economic costs of the regulation are relevant on remand," at 389. But it is the role of the Legislature to weigh the cost of assistance against the social obligation to care for those unable to provide for themselves, and it has clearly resolved the issue in favor of assistance. The Director is legally bound to set the assistance at a level that provides a "minimum standard of living compatible with decency and health." *N.J.S.A.* 44:7–81(c). He may not contravene this clear legislative entitlement. To the extent that the Commissioner argues otherwise, and to the extent that the majority

upon the introductory clause in *N.J.S.A.* 44:7–76, which reads "[s]ubject to the provisions of this act..." Somehow, the majority finds that this stock phrase gives the Commissioner full discretion to enforce or to ignore the substantive provisions of the statute. There is no justification for this interpretation.

The Majority reads *N.J.S.A.* 44:7–81(c) as the provision granting discretion to the Commissioner. In fact, *N.J.S.A.* 44:7–81(c) unequivocally directs the Commissioner to set eligibility standards "making due allowance for a minimum standard of living compatible with decency and health." The act does not merely suggest that the Commissioner set such standards in his discretion; it directs him to act in accord with the statutory criteria.

opinion accepts that position, they fundamentally misconstrue the function of administrative agencies.

The record before us clearly demonstrates that the challenged eligibility standards are contrary to the MAA statute. For two of the plaintiffs here, the monthly cost of necessary medical services covered by MAA actually exceeds their total monthly income. Two others would have less than $100 per month remaining for necessities such as food and rent. *See* at 379, n.1. It would hardly be an overextension of judicial notice for us to conclude that minus $306.72 (Coppola) or even $92.50 (Ciccone) is an inadequate monthly income "for a minimum standard of living compatible with decency and health." *N.J. S.A.* 44:7–81(c). Yet, both of these plaintiffs are ineligible for MAA under the current eligibility criteria.

The record further shows that the MAA eligibility standards have remained unchanged since 1963, even though prices have more than doubled since then. It strains credulity to the limit to suggest that the 1963 standard was so generous that it has survived the ravages of inflation. The clear evidence shows that those standards are, in 1982, so stingy that they bear no relation whatever to any minimum standard of living, much less one which reflects decency and health.

For these reasons, I would hold the challenged eligibility criteria invalid on their face. They are contrary to a clear legislative enactment and are therefore illegal. *Chamber of Commerce, supra.*

Plaintiffs here are elderly, indigent, and of failing health. They are among the most vulnerable persons in our society. The New Jersey Legislature has repeatedly manifested its beneficent concern for the well-being of the elderly members of our community. At 387–388. The MAA program is a worthy reflection of that concern. By establishing unduly parsimonious eligibility criteria, the Commissioner has undermined this necessary humanitarian program. But it is not the Commissioner's privilege to lower the statutory criteria. It is his duty to obey the law.

The current eligibility criteria contravene the statute. I would order the Commissioner to promulgate new regulations which set assistance at a level consistent with a minimum standard of living compatible with decency and health. The majority does not do so. I therefore dissent.

*For affirmance and modification*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*Dissenting*—Justice PASHMAN—1.