STEVEN A. MAIETTA, RESPONDENT, v. NEW JERSEY RACING COMMISSION, APPELLANT.

Argued February 7, 1983—Decided April 25, 1983.

*John A. Covino,* Deputy Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *John A. Covino, Frederick M. Knapp* and *Charles J. Hanlon, Jr.,* Deputy Attorneys General, of counsel; *John A. Covino* and *Frederick M. Knapp,* on the brief).

*Zulima V. Farber* argued the cause for respondent (*Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan,* attorneys).

PER CURIAM.

Respondent, Steven A. Maietta, applied to the New Jersey Racing Commission (Commission), the appellant before us, for

licensure as a groom. The Commission denied the application on the basis of Maietta's drug-related criminal record. The Appellate Division reversed and ordered that the Commission issue the license to Maietta. *Maietta v. New Jersey Racing Comm'n,* 183 *N.J.Super.* 397 (1982). It held that the Rehabilitated Convicted Offenders Act (RCOA), *N.J.S.A.* 2A:168–1 to –6, applies to the Commission's licensing function, and that under the circumstances the Commission erred in denying licensure to respondent after having adopted the findings of an Administrative Law Judge (ALJ). *Id.* at 405–06. We granted the Commission's petition for certification, 91 *N.J.* 252 (1982). In affirming the judgment below we place considerable reliance on the reasoning of Judge Pressler's opinion for the Appellate Division, supplemented and varied only by what follows here.

I

The essential facts are adequately stated in the Appellate Division opinion as follows:

In May 1976 Maietta, then 23 years old and the holder of a groom's license issued by the New York State Racing and Wagering Board, was indicted in New York State. The offenses with which he was charged, alleged to have occurred in December 1975, were possession of methaqualone and possession thereof with intent to distribute, possession of amphetamine-methamphetamine, and possession of diazepam. Under New York law, according to the indictment, methaqualone is a controlled dangerous substance of the sixth degree and the other two drugs he was charged with possessing are controlled dangerous substances of the seventh degree. Following the indictment, Maietta gave his full cooperation to the authorities and, apparently pursuant to a plea agreement, all charges were dismissed against him except possession of a seventh degree controlled dangerous substance. He was sentenced on January 14, 1977 to a three-year probationary term.

In 1976 an 11-count indictment was returned by the Union County New Jersey grand jury, the first count of which charges Maietta and nine others with conspiracy to distribute controlled dangerous substances. Maietta, unlike other of the codefendants, was not charged with any substantive offense, and his participation in the conspiracy was alleged to consist of the making of telephone calls in aid thereof. There appears to be no question that the same conduct formed the basis of both the New York and the New Jersey indictments against Maietta. He pleaded guilty to the New Jersey conspiracy charge and was sentenced in May 1977 to a suspended jail term of 300 days and one year's probation to run concurrently with the New York probationary term. The judge's written statement of reasons for the imposition of this sentence was, in full, that "defendant's role in this was minor in nature, in view of the overall circumstances."

While the record does not reveal the specific circumstances surrounding Maietta's offenses, it is undisputed that they had nothing to do with horseracing and that the drugs involved have nothing to do with horses. Nor is there any suggestion that Maietta is himself a drug user.

Following the New York conviction Maietta left his groom's employment at the Roosevelt Raceway and obtained a job at a turn-out or rest farm for standard bred horses with the approval of his probation officer. It further appears that his conduct while on probation was exemplary and that he was accorded an early discharge therefrom. In December 1977, just short of a year from the date of his New York conviction, he was successful in obtaining a New York State Certificate of Relief From Disabilities, and in September, 1978 the New York State Racing and Wagering Board restored his groom's license, leading to his reemployment in that position at Roosevelt Raceway and, since then, at the Monticello and Yonkers Harness Racetracks as well. In 1980, on his application supported by the endorsements of six active drivers and trainers, he was accorded membership in the

United States Trotting Association, which then granted him a trainer's license and a driver's license.

In view of the foregoing factual background and his New York record of successful rehabilitation and work experience following the conviction, Maietta, in December 1979, requested the New Jersey Racing Commission to review informally his qualifications for licensure as a groom. Informal discussions ensued during the course of which both the involved New York and New Jersey probation officials submitted letters to the Commission in support of Maietta's licensing request. Both letters recited the facts of his excellent probation record and concluded that he was fully rehabilitated. The New York probation officer, the Director of Probation of Nassau County, further stated that Maietta's "proposed employment will not be incompatible with the welfare of society," and the New Jersey probation officer, the Chief Probation Officer of Union County, concluded that in his opinion it did not seem that Maietta's "intended employment will be incompatible with the welfare of society." The Commission nevertheless advised Maietta in June 1980 that it was "reluctant" to grant him a New Jersey groom's license because of the drug related convictions. Maietta then requested a formal proceeding and the matter was referred as a contested case to an administrative law judge for hearing.

At the hearing the Commission did not challenge the applicability of RCOA to its licensing function but argued rather that it had not abused the discretion accorded it by RCOA in denying Maietta a groom's license. The administrative law judge disagreed. After reviewing and evaluating the facts, he concluded as follows:

Based upon the evidence comprising the entire record, I am unable to conclude as did the Racing Commission that simply because Maietta would be in contact with horses on a daily basis that the crimes for which he was convicted inexorably involve an adverse relationship to his proposed employment as a groom. While convictions for drug offenses certainly are of special concern in the racing industry, as well as in many other fields which are closely supervised, it would appear that the Racing Commission in this case did not make any special effort, if at all, to analyze the statutory factors contained in RCOA and

their relationship to the particular circumstances of Maietta's case. Rather, what the Racing Commission appears to have done is to deny the license application strictly on the basis of the convictions themselves without consideration of the surrounding circumstances. Since entering his pleas of guilty and his sentencing, Maietta has demonstrated a fine rehabilitation record. The fact that senior probation officials in two states have specifically so stated is significant.

Accordingly, based upon my independent review of the entire record in this matter, and taking fully into consideration the spirit and intent of RCOA, and after having had an opportunity to observe the applicant offering testimony, it is my opinion that the grant of a license to Maietta as a groom would not contravene the public interest. Since the preliminary determination by the Racing Commission did not take into account the several statutory factors contained in RCOA, it cannot be sustained.

I specifically find, that in view of the nature of the crimes for which Maietta was convicted, the circumstances of his involvement, the date of the criminal conduct, the isolated nature of the incident and the clear evidence of his rehabilitation, his license application is appropriate and should have been granted. I further find, from the evidence before me, that Maietta has demonstrated an ability to comply with the norms and requirements of society and that his licensure would not bc incompatible with society's welfare nor with the good and welfare of the racing industry in particular.

There should be no doubt that the standards to be applied when applicants with criminal convictions seek licensure from the New Jersey Racing Commission must be quite high. However, I find no indication from the statutes nor from the regulations that they are intended to be insurmountable. Accordingly, based upon the foregoing findings, I CONCLUDE that the Commission's denial of the license application in this case failed to give due consideration to the requirements of RCOA. Accordingly, the Commission's preliminary determination should be set aside and a groom's license issued to Steven A. Maietta. [183 *N.J.Super.* at 398–401.]

The Commission adopted the findings of fact by the ALJ as included in the foregoing excerpt from the Appellate Division opinion, but nevertheless refused to issue the license on account of Maietta's criminal record.

## II

■ Under *N.J.S.A.* 2A:168A–1,

notwithstanding the contrary provisions of any law or rule or regulation issued pursuant to law, a person shall not be disqualified or discriminated against by any licensing authority because of any conviction for a crime * * * unless the conviction relates adversely to the occupation, trade, vocation, profession or business for which the license or certificate is sought.

Two exceptions to the statute are relevant in this case, both of which were relied on by this Court in *In re Schmidt,* 79 *N.J.* 344 (1979). In *Schmidt* we held that the RCOA did not apply to the Division of Alcoholic Beverage Control (ABC) because that agency regulated a unique industry, susceptible to inherent evils and treated by the legislature in a special fashion. *Id.* at 354. In addition we held that the RCOA provisions did not apply to the ABC because the ABC was an exempt law enforcement agency under *N.J.S.A.* 2A:168A–6. *Id.* at 354–55. The Commission argues that it should be exempt from the RCOA for the same reasons that applied to the ABC. We disagree.

Although we are well aware that the Commission holds broad regulatory powers in light of the strong public interest in the honesty of horse racing and parimutuel wagering, *see, e.g., Garifine v. Monmouth Park Jockey Club,* 29 *N.J.* 47 (1959); *State v. Garden State Racing Ass'n,* 136 *N.J.L.* 173 (E. & A.1947); *State v. Dolce,* 178 *N.J.Super.* 175 (App.Div.1981), and that the alcoholic beverage and racing industries have been previously grouped together by this Court, *see Garifine v. Monmouth Park Jockey Club, supra,* 29 *N.J.* at 55, there are significant differences between the statutory schemes affecting the ABC and the Commission that require dissimilar treatment in respect of the RCOA.

Under both Acts, licenses shall not be issued to persons who have been convicted of crimes involving moral turpitude. *N.J. S.A.* 5:5–34 (horse racing); *N.J.S.A.* 33:1–25 (alcoholic beverages). With regard to the alcoholic beverage industry, however, there are certain "savings" provisions that cut back on the apparent absolute authority of the director; similar provisions are not a part of the racing laws. Under *N.J.S.A.* 33:1–26, "[p]ersons failing to qualify * * * by reason of conviction of a crime involving moral turpitude may, with the approval of the director, and subject to rules and regulations, be employed by any licensee." In addition, *N.J.S.A.* 33:1–31.2 provides as follows:

> Any person convicted of a crime involving moral turpitude, may after the lapse of five years from the date of conviction, apply to the commissioner for an order removing the resulting statutory disqualification from obtaining or holding any license or permit under this chapter. Whenever any such application is made and it appears to the satisfaction of the commissioner that at least five years have elapsed from the date of conviction, that the applicant has conducted himself in a law-abiding manner during that period and that his association with the alcoholic beverage industry will not be contrary to the public interest, the commissioner may, in his discretion and subject to rules and regulations, enter an order removing the applicant's disqualification from obtaining or holding a license or permit because of the conviction.

These sections remove the statutory disqualification in certain instances and thus serve the same purpose as the RCOA.[1]

Since similar "savings" provisions are absent from horse racing legislation, we hold that the Commission is subject to the provisions of the RCOA. As stated by the court below, "to exempt the Racing Commission from RCOA because of the nature of the controlled industry would be inevitably to initiate an erosion and abrogation of RCOA which, in our view, would improperly impinge upon and finally defeat the legislative intention." 183 *N.J.Super.* at 405.

The Commission argues that it should be considered a "law enforcement agency," thus exempt from the RCOA under *N.J.S.A.* 2A:168A–6. Although the Commission holds certain "law enforcement" powers, those powers are less significant than the powers held by the ABC, and are insufficient to qualify it for statutory exemption.

In *Schmidt,* we pointed out the unique character of the ABC among licensing agencies in its broad law enforcement powers, noting particularly (1) the authority, under *N.J.S.A.* 33:1–4, of the Director, his deputies, inspectors and investigators to effect warrantless arrests for violations of the ABC act committed in their presence; (2) the authority and powers, under the same

---

[1] We note that the Casino Control Act was amended subsequent to our decision in *Schmidt* to include "savings" provisions identical to the terms of the RCOA, *N.J.S.A.* 2A:168A–2. See *N.J.S.A.* 5:12–90(h); *N.J.S.A.* 5:12–91(d).

statute, of peace officers[2] to enforce the act; (3) the duty of inspectors and investigators to arrest all persons they have reasonable grounds to believe are committing or have committed a misdemeanor under Title 33; (4) the Director's power to inspect and conduct warrantless searches of licensed premises and to subpoena witnesses; and (5) the exemption of certain ABC officials from the provisions of the Concealed Weapons Act, *N.J.S.A.* 2A:151–43(p).[3] It was on the basis of these far-reaching powers that we perceived a legislative intention to set the ABC apart from other licensing agencies and to treat it as a law enforcement agency within the meaning of section 6 of the RCOA. We concluded therefore that the RCOA did not apply to the ABC. 79 *N.J.* at 354–55.

In contrast to the broad powers noted above, the Racing Commission exercises limited powers, as described by the court below:

> [T]he enforcement of the act is not primarily the Commission's responsibility or within its authority but is rather the direct responsibility of the Attorney General and the county prosecutors.[4] It is true, as the Commission points out, that *N.J.S.A.* 5:5–77 accords it the power to appoint four persons to exercise the powers of municipal police officers to make arrests, execute criminal process and enforce both the criminal laws of the state and the provisions of the act. We do not, however, regard the limited powers of the commission to appoint four police officers to perform routine police functions as sufficient to warrant characterizing the Commission itself as a law enforcement agency. By that reasoning every municipality which employs police officers would also thereby become itself a law enforcement agency exempt from the RCOA. That was clearly not the legislative intention.

---

[2]In addition, *N.J.S.A.* 33:1–1(p) defines an officer as "[a]ny sheriff, deputy sheriff, constable, police officer, member of the State police, or any other person having the power to execute a warrant for arrest, or any inspector or investigator of the Division of Alcoholic Beverage Control."

[3]That section was repealed; however, the exemption now appears in *N.J. S.A.* 2C:39–6(a)(4). Just as important as this exemption is the absence of one for Racing Commission personnel.

[4]Compare *N.J.S.A.* 5:5–76 (enforcement of the Act is the direct responsibility of the Attorney General and county prosecutors) *with N.J.S.A.* 33:1–4(d) (enforcement of the Alcoholic Beverage Law is the direct responsibility of the director, along with his deputies, inspectors and investigators).

We also recognize that the Commission has promulgated regulations suggestive of its law enforcement powers. But regulations adopted by an agency do not by themselves alter the agency's essential character as defined by its own enabling legislation. Nor are the regulations here relied on by the Commission unique to "law enforcement" agencies. They are, rather, typical of administrative agency powers. Thus, *N.J.S.A.* 13:71–23.18 requires Racing Commission officials and licensees to cooperate with the State police, *N.J.A.C.* 13:71–5.2 requires track security personnel to file daily reports with the State police, *N.J.A.C.* 13:71–5.2 requires track security personnel to file daily reports with the State police, *N.J.A.C.* 13:71–1.3 requires participants and patrons to abide by Commission rules and *N.J.A.C.* 13:71–23.17 requires judges who discover that a horse is drugged to notify the State Police and to authorize a search and investigation with the assistance of the State Police. It is thus plain to us that unlike the self-initiating and self-executing law enforcement powers of the personnel of the Division of Alcoholic Beverage, the Racing Commission is, except for its four appointed police officers, required both by statute and regulation to rely on conventional law enforcement services. [183 *N.J.Super.* at 403–04.]

## III

Having held that the Commission is subject to the RCOA, we must determine whether it abused its discretion in denying licensure to Maietta. Under *N.J.S.A.* 2A:168A–2, the Commission could deny Maietta's application if it concluded that his conviction "relate[d] adversely to the occupation * * * for which the license * * * is sought." However, to deny a license on that ground, the Commission must explain in writing how the following factors, or any others, relate to the license sought:

a. The nature and duties of the occupation, trade, vocation, profession or business, a license or certificate for which the person is applying;

b. Nature and seriousness of the crime;

c. Circumstances under which the crime occurred;

d. Date of the crime;

e. Age of the person when the crime was committed;

f. Whether the crime was an isolated or repeated incident;

g. Social conditions which may have contributed to the crime;

h. Any evidence of rehabilitation, including good conduct in prison or in the community, counseling or psychiatric treatment received, acquisition of additional academic or vocational schooling, successful participation in correctional work-release programs, or the recommendation of persons who have or have had the applicant under their supervision.

■ The Commission denied Maietta's application for licensure after accepting the ALJ's findings of fact and rejecting his recommendation. Thus we are left with a question of law—whether the Commission properly ruled that Maietta's conviction "related adversely to the license sought" in light of the adopted findings of fact. We conclude that the Commission erroneously denied the application for licensure. Of significance in this decision are Maietta's minor participation in criminal activity, the five-year hiatus between the criminal conduct and the application for licensure, the isolated nature of the criminal conduct, and the overwhelming evidence of rehabilitation. The ALJ recognized these factors, and the Appellate Division correctly adopted his approach. 183 *N.J.Super.* at 406 & n. 1.

Affirmed.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK and GARIBALDI—4.

*For reversal and remandment*—Justices SCHREIBER and O'HERN—2.

SCHREIBER, J., dissenting.

I disagree with the principles stated in the majority opinion with respect to the application of the Rehabilitated Convicted Offenders Act (RCOA), *N.J.S.A.* 2A:168A–1 to –6, to the licensing function of the New Jersey Racing Commission. In *In re Disciplinary Proceedings Against Schmidt,* 79 *N.J.* 344, 353 (1979), the Court refused to apply the RCOA to the liquor industry since, at least in part, that business had been dealt with by the Legislature in an exceptional way "because of its susceptibility to inherent evils." That same pervasive control and concern are present here. The State has treated racing in a special way. Thus the constitutional prohibition against bookmaking or gambling was amended in 1939 to permit horse racing at which a parimutuel system of betting is permitted. *N.J. Const.* (1844), Art. IV, § VII, par. 2: *see also N.J.Const.* (1947), Art. IV, § VII, par. 2. No constitutional provision concerns the liquor industry. Moreover, the racing industry "entail[s] inher-

ent dangers and [is] clearly affected with a public interest."
*Garifine v. Monmouth Park Jockey Club,* 29 *N.J.* 47, 55 (1959).
I would hold that the RCOA is inapplicable to the racing
industry.

The majority distinguishes the New Jersey Racing Commis-
sion from the Alcoholic Beverage Control Commission because
under the liquor statute a person convicted of a crime may, after
the lapse of five years from the date of conviction, apply for an
order removing the disqualification; there is no comparable
provision in the racing law. That ground is nebulous at best for
the racing

> commission [has] full power to prescribe rules, regulations and conditions under
> which all such licenses are issued in the State of New Jersey and to revoke or
> refuse to issue a license if in the opinion of the commission the revocation or
> refusal to issue such a license is in the public interest . . . . [*N.J.S.A.* 5:5–33]

This section indicates that the Racing Commission has an even
greater control over the racing industry than the Director has
over the liquor business. Further, the Racing Commission could
adopt a regulation containing the same substantive provision as
exists in the liquor statute, *N.J.S.A.* 33:1–31.2. Since that
power exists, the apparent distinction is simply apparent and not
real.

Even if the Commission were subject to RCOA as the majori-
ty holds, the Commission should be given the opportunity to
explain why Maietta's application was denied. This it has never
done.[1] Even though the RCOA factors favor licensing, it has
been our practice to allow the agency to exercise its statutory
function in light of newly defined standards. *Cf. Zigmont v.
Board of Trustees,* 91 *N.J.* 580 (1983) (remand pension applica-
tion to Board of Trustees to apply stated factors); *Dougherty v.
Human Services Dep't,* 91 *N.J.* 1 (1982) (remand Medicaid appli-

---

[1]Under *N.J.S.A.* 2A:168A–2 the regulatory authority must explain in writing
how eight enumerated factors "relate adversely" to the occupation for which
the license is sought. *Ante* at 10. However, these are not exclusive and
the Commission, accepting the Administrative Law Judge's findings, could
reasonably conclude that a license was not warranted.

cation to Commissioner of Department of Human Services to act on possible waiver); *Texter v. Human Services Dep't,* 88 *N.J.* 376, 383 (1982) (remand to Commissioner of Department of Human Services to reevaluate income level set in regulation in light of deviation from statutory scheme and "the interest of justice").

The Racing Commission has decided, through its rulemaking authority, to exercise strict control over the use of narcotics. *N.J.A.C.* 13:71–23.6; 13:71–23.12. In accordance with this decision, it adopted *N.J.A.C.* 13:71–23.14, which provides that: "Any person who has been convicted of possession or use of narcotics by any court in the land shall be denied a license or ruled off or both as the Commission may decide." The Court has now determined that this regulation, *N.J.A.C.* 13:71–23.14, is invalid because of the statutory provisions of the RCOA. In this respect the Court's judgment is similar to that in *Texter.* The Racing Commission may wish to restate the policy of that regulation consistent with the RCOA. I believe "that the appropriate judicial role is to defer to the legislative determination that the administrative agency should have the opportunity to review its regulations." *Texter,* 88 *N.J.* at 387. The Court would be especially remiss to exercise the primary licensing function of the regulatory agency in a field as sensitive as gambling.[2] The Court has granted such regulatory agencies broad discretion to protect the public interest. *See also In re Boardwalk Regency Corp. Casino License,* 90 *N.J.* 361 (1982) (questionable business associations can sustain basis for Commission's denial of gaming license).

It may be that upon deliberation the Racing Commission will conclude that public confidence in racing can be sustained through careful licensing of former drug offenders in compli-

---

[2]*In re Kallen* 92 *N.J.* 14 (1983), restated the settled principle that it is the agency head who shall exercise the decisional power.

ance with the statutory scheme. The Court should leave individual decisions to the Racing Commission.

Justice O'HERN joins in this disposition but would hold the RCOA applicable to the New Jersey Racing Commission.